Dorothy L. COLE, Lois H. Zisook, Harry W. Voege, and Anna May Tunmore, as Trustees, Samuel Greenfield Fund, Inc. and Harold Stiller and Mildred Stiller, as joint tenants, Plaintiffs,

Dorothy L. Cole, Harry W. Voege, and Anna May Tunmore, as Trustees, and Harold Stiller and Mildred Stiller, as joint tenants, Plaintiffs-Appellants,

v.

SCHENLEY INDUSTRIES, INC., Glen Alden Corporation, Rapid-American Corporation, Isidore A. Becker, Bernard Goldberg, Paul A. Johnston, David A. Chernow, Walter O. Heinze, Howard Feldman, Milo B. Hopkins, Russell G. Smith, Albert N. Greenfield, Meshulam Riklis, Glen Alden Subsidiary, Inc., P. J. Clifford, W. P. Johnson, S. Kittay, M. L. Mendell, L. C. Lane, G. H. Perkins and B. Denmark, Defendants-Appellees.

Nos. 1278, 1279, 1280, Dockets 77–7125, 77–7126 and 77–7139.

United States Court of Appeals, Second Circuit.

Argued June 13, 1977.

Decided Sept. 9, 1977.

As Modified on Rehearing Oct. 25, 1977.

Herman Odell, New York City (Victor Brudney and John F. Zulack, New York City, of counsel), for plaintiff-appellant Cole.

Charles Trynin, New York City, for plaintiffs-appellants Voege and Tunmore.

Leon Silverman, New York City (Fried, Frank, Harris, Shriver & Jacobson, New York City, Simpson, Thacher & Bartlett, Rubin, Baum, Levin, Constant & Friedman, Milton B. Seasonwein, New York City, of counsel), for defendants-appellees.

Before SMITH and OAKES, Circuit Judges, and CARTER,* District Judge.

J. JOSEPH SMITH, Circuit Judge:

This is an appeal from a final judgment entered in the United States District Court for the Southern District of New York, Richard Owen, Judge, dismissing a consolidated complaint challenging the merger of Schenley Industries, Inc. ("Schenley"), a subsidiary of Glen Alden Corporation ("Glen Alden"), with a wholly-owned subsidiary of Glen Alden. Appellants appeal from Judge Owen's decision after a non-jury trial on the issue of liability, dismissing the federal securities claim and a third party beneficiary claim on the merits, and from his refusal to assume pendent jurisdiction over state claims alleging breach of fiduciary duty by the controlling shareholders and unfairness of the merger terms. They also raise a state statutory claim and a federal constitutional claim not explicitly addressed in the district court opinion. We remand for further consideration in light of a recent state court decision.

The pertinent facts leading to the instant action are as follows. In March 1968, during a contest for control of Schenley, Glen Alden purchased 18 percent of Schenley's common stock at $53.33⅓ per share from Lewis S. Rosenstiel, founder and chairman of the board of Schenley. The agreement of purchase and sale with Rosenstiel recited that it was the intention of the parties that the remaining minority holders of Schenley common stock were to be afforded an opportunity to sell their shares to Glen Alden at a price comparable to or more favorable than the price paid to Rosenstiel. In August 1968 Glen Alden made a formal offer to purchase the common stock of the remaining shareholders of Schenley for

---

* Honorable Robert L. Carter, United States District Judge for the Southern District of New York, sitting by designation.

$58.66⅔ per share. Through open market purchases followed by this tender offer Glen Alden acquired more than 86 percent of Schenley's common stock.

In February 1971 Glen Alden announced a proposed merger with Schenley. Under the terms of the merger, Glen Alden offered Schenley's minority common shareholders a cash payment of $5 and a 7½ percent Glen Alden debenture in the principal amount of $30 due in 1985 in exchange for each share. Schenley's preferred shareholders were offered a cash payment of $4.50 and a 7½ percent Glen Alden debenture in the principal amount of $27 due in 1985 in exchange for each share. It is undisputed that the fair market value of this offer was $29 per share of common stock and $26.10 per share of preferred stock. On June 17, 1971 Schenley and Glen Alden Subsidiary Corporation, a wholly-owned subsidiary of Glen Alden, merged, with Schenley surviving as the resulting corporation.

Four separate suits were originally filed challenging the merger.[1] In each, Schenley, its board of directors, and Glen Alden were the principal defendants. By order of Judge Motley, the four actions were consolidated pursuant to Rule 42(a), Fed.R.Civ.P., on August 10, 1971. This appeal follows a non-jury trial on the issue of liability based on the consolidated complaint.

The amended consolidated complaint consisted of five counts, only three of which are at issue on appeal. Count I alleged violations of § 10(b) of the Securities Act of 1934 ("the 1934 Act"), 15 U.S.C. § 78j, and Rule 10b–5 thereunder, 17 C.F.R. § 240.-10b–5, and of § 14(a) of the 1934 Act and Regulation 14a–9 thereunder, 15 U.S.C. § 78n(a). Count II alleged that the merger was invalid under the laws of Delaware because it involved a breach of fiduciary duty by Glen Alden and the Schenley di-

rectors toward the minority shareholders. Count III alleged violations of § 22 of the Securities Act of 1933, 15 U.S.C. § 77a *et seq.* and §§ 27 and 10(b) of the 1934 Act arising from the breach of a third-party beneficiary contract to which common stock owners of Schenley were alleged to be parties. Early in the course of trial Judge Owen ruled that he would not permit introduction of evidence which related solely to the state claim raised in Count II. He declined to exercise pendent jurisdiction as to this count.

### I.

■ We first address the jurisdictional basis for this action. Consolidation under Rule 42(a), Fed.R.Civ.P., is a procedural device designed to promote judicial economy, and consolidation cannot effect a merger of the actions or the defenses of the separate parties. It does not change the rights of the parties in the separate suits. *Johnson v. Manhattan Ry.*, 289 U.S. 479, 496–97, 53 S.Ct. 721, 77 L.Ed. 1331 (1933); *Garber v. Randell*, 477 F.2d 711 (2d Cir. 1973). Rights are unaffected even though a consolidated complaint is filed. *Katz v. Realty Equities Corp. of New York*, 521 F.2d 1354 (2d Cir. 1975). We must therefore consider the jurisdictional basis of each complaint separately.

Appellant Dorothy Cole's complaint before us on appeal includes Counts I and II only. Jurisdiction on Count I rests on the 1934 Act, 15 U.S.C. § 78aa. Jurisdiction on Count II is based on diversity, 28 U.S.C. § 1332. Cole is a citizen of Florida, while the defendant corporations are citizens of Delaware and New York. Cole has alleged more than $10,000 in controversy, and this allegation is uncontested.

Harold and Mildred Stiller are citizens of New York. Jurisdiction on Count I rests on

---

1. The four groups of plaintiffs included Cole, owner of Schenley convertible preferred, Voege and Tunmore, owners of Schenley common, and Harold and Mildred Stiller, owners of Schenley preferred, appellants in this action. Cole is a citizen of Florida. Voege, Tunmore and the Stillers are citizens of New York. The

Cole and Stiller complaints were identical. The Stillers have not filed a separate brief on appeal.

Class action status was granted to all plaintiffs in May 1973. 60 F.R.D. 81 (S.D.N.Y.1973), Weinfeld, J. See also *Becker v. Schenley Industries, Inc.*, 557 F.2d 346 (2d Cir. 1977).

the 1934 Act, as it does for Cole. Since there is no diversity between the Stillers and the appellees, the sole basis for jurisdiction on Count II as to the Stillers is discretionary exercise of pendent jurisdiction. The Stillers are not party to Count III of the complaint.

Voege and Tunmore invoke jurisdiction under 15 U.S.C. §§ 77v and 78aa. Voege is a citizen of New York. Tunmore is a citizen of Pennsylvania. Pendent jurisdiction is invoked as to their state claims.

We consider each count separately.

## II.

A lengthy proxy statement,[2] dated May 21, 1971, was sent to the shareholders in connection with a shareholders' meeting scheduled for June 17, 1971. Appellants claim that this proxy statement violated § 14(a)[3] of the 1934 Act and SEC Rule 14a–9,[4] in three principal ways: (1) the proxy statement did not accurately show how much cash Schenley had, (2) the proxy statement did not adequately reveal how much cash would be transferred from Schenley to Glen Alden, and (3) the proxy

statement did not adequately reveal the value of a share of Schenley stock.

In May 1971 Glen Alden owned about 84 percent of the voting power of the outstanding capital stock of Schenley,[5] and the proxy statement said that Glen Alden intended to vote its shares in favor of the merger.[6] The threshold question is whether "the proxy solicitation itself . . . was an essential link in the accomplishment of the transaction." *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 385, 90 S.Ct. 616, 622, 24 L.Ed.2d 593 (1970).

■ A Schenley minority shareholder had four options in May 1971: (1) accept Glen Alden's offer, (2) seek appraisal rights under Delaware law, (3) threaten to seek appraisal rights in an attempt to force Glen Alden to improve its offer, and (4) seek to enjoin the merger. The minority shareholders owned about 1.1 million shares of common stock and about 2.5 million shares of preferred stock of Schenley; if all, or a substantial portion, had exercised, or threatened to exercise, their appraisal rights, Schenley would have had to set aside a considerable sum of cash and the merger

2. The proxy statement is 66 pages, and there are an additional 57 pages of financial tables and exhibits. While quite long, in view of the material to be covered, we do not consider this an example of "[burying] the shareholders in an avalanche of trivial information—a result that is hardly conducive to informed decision-making." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 448–49, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757 (1976).

3. Section 14(a) says:
   It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title.

4. Rule 14a–9 says:
   No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or

other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

5. Glen Alden owned 86 percent of Schenley's issued and outstanding common stock and none of Schenley's preferred stock. Each share of preferred stock was entitled to $\frac{1}{10}$ vote.

6. Pages 8–11 of the proxy statement describe various pending actions by Schenley shareholders opposing the merger. Minority shareholders had "ample notice that [Glen Alden] was strongly promoting the merger which it deemed to be in its interest as the dominant stockholder of [Schenley], while other stockholders were opposing the merger." *Rosenblatt v. Northwest Airlines, Inc.*, 435 F.2d 1121, 1127 (2d Cir. 1970).

might not have been consummated.[7] It was also possible that if additional information could be extracted the minority shareholders would have been able to enjoin the merger under Delaware law.[8] *Popkin v. Bishop*, 464 F.2d 714, 720 (2d Cir. 1972). We need not decide whether such a suit would have been successful under Delaware law. In view of these three alternatives to accepting the Glen Alden offer, we hold that the proxy solicitation was an essential part of the merger. *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 381–84 (2d Cir. 1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975).

We turn now to the difficult question of whether there was a material misrepresentation in the proxy statement dealing with this merger. The Supreme Court has said that in a § 14 claim the test of materiality depends upon "a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757 (1976). *Securities and Exchange Comm'n v. Parklane*

*Hosiery Co.*, 558 F.2d 1083, 1087 (2d Cir. 1977); *Tannenbaum v. Zeller*, 552 F.2d 402 (2d Cir. 1977). "While 'corporations are not required to address their stockholders as if they were children in kindergarten,' it is not sufficient that overtones might have been picked up by the sensitive antennae of investment analysts." (citations omitted.) *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1297 (2d Cir. 1973).[9]

### A.

Appellants claim that in May 1971 Schenley had $191 million in cash and marketable securities and that the proxy statement misrepresented this by saying (at p. 3) that as of December 31, 1970 Schenley had $162 million in "cash, certificates of deposit, and marketable securities." Judge Owen said "the difference is not of consequence to the determination herein." We think the difference, if not disclosed, would be significant, but we find that the proxy statement adequately disclosed Schenley's cash holdings.

Appellees argue that the net proceeds to Schenley of the sale of its subsidiary, Buckingham,[10] come to about $90 million. The

---

7. About 250 Schenley shareholders did obtain appraisal of their shares. In 1975 the appraisal value of the common stock was set at $33.86 per share and of the preferred stock at $30.47 per share. *Gibbons v. Schenley Industries, Inc.*, 339 A.2d 460, 474 (Del.Ch.1975). At this price all the minority shares had an appraisal value of about $114 million. Section 5.1 of the Plan and Agreement of Reorganization allows the merger to be abandoned by mutual consent of Glen Alden and Schenley. *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1303 n. 24 (2d Cir. 1973).

8. In three suits minority shareholders did try to enjoin the merger. *Voege v. Smith*, 329 F.Supp. 180 (S.D.N.Y.1971) focused on the 1968 Glen Alden offer to Schenley stockholders, and Judge Lasker said the complaint did not allege "any facts showing a failure to disclose, or misrepresentation by commission or omission." *Id.* at 183. *David J. Greene & Co. v. Schenley Industries, Inc.*, 281 A.2d 30 (Del. Ch.1971) focused on the fairness of the 1971 Glen Alden offer. Neither of these suits focused on whether a merger whose sole purpose is the transfer of funds to another corporation violates Delaware law. The decision in· the third suit to enjoin the merger is unreported.

9. Appellant Cole invites this court to apply a different legal standard of materiality to proxy statements involving mergers. Cole argues that in a merger management should be required to supply a more complete analysis because, unlike a contested tender offer, nobody will inform the shareholder of the opposing arguments. We decline the invitation. Many issues presented to the shareholders of a large publicly-held corporation raise potential or actual conflicts of interest between management and some or all shareholders. As this case illustrates, for example, the earlier decision to incorporate Schenley in Delaware had serious implications in 1971 for Schenley's minority shareholders.

10. Buckingham, whose sole business was importing and selling Cutty Sark Scotch whisky, was a wholly-owned subsidiary of Schenley. Pursuant to an antitrust consent decree, Schenley sold Buckingham to Northwest Industries, Inc. on May 10, 1971 for $120 million, consisting of $103 million in cash and $17 million principal amount of 9½ percent notes of Northwest maturing March 1, 1979.

net sales price of Buckingham was $120 million. Page 44 of the proxy statement says that taxes and fees on the Buckingham sale come to about $14 million and that $10.5 million of the proceeds are to be used to prepay some of Schenley's outstanding debts to insurance companies. While page 44 of the proxy statement says that the pro forma effect of the Buckingham sale will be to give Schenley additional cash of $95.4 million, this is not a significant difference from the $90 million figure on page 3 of the proxy statement.

On appeal appellant Cole seems to concede (Brief for Appellant Cole at 29, n*) that the proxy statement adequately shows the net proceeds of the Buckingham sale but argues that the proxy statement should have included as part of Schenley's cash and marketable securities $14 million that Schenley received in February 1971 when it sold Guild Wine Company and about $16 million of Glen Alden 6 percent debentures that Schenley had purchased prior to May 1971. Page 44 of the proxy statement specifically refers to the sale of Guild Wine Company and says that the pro forma financial statements exclude the proceeds of this sale. Appellants do not dispute appellees' claim that the 6 percent debentures were not readily marketable.[11] The proxy statement shows (at p. F–24) these debentures as a Schenley "investment" rather than as a "current asset."

We think that the proxy statement adequately set forth Schenley's cash position as of December 31, 1970, after giving pro forma effect to the sale of Buckingham.

### B.

█ Appellants argue that the proxy statement did not reveal that Schenley would transfer to Glen Alden $81.6 million immediately and another $36 million by the end of 1973.[12] Appellees point out that the second paragraph of the proxy statement

says, in bold print, "It should also be noted that, in connection with the reorganization, Schenley will transfer to Glen Alden substantial funds of Schenley, including a substantial part of the proceeds received by Schenley from the recent sale of its subsidiary, The Buckingham Corporation." Similar statements appear at pages 3 and 43 of the proxy statement.

In *TSC Industries, Inc. v. Northway, Inc.,* *supra,* one of the claims by Northway, a TSC shareholder, was that a proxy statement's reference to "the substantial premium over current market value represented by the securities being offered to TSC stockholders" violated § 14. Northway argued that a TSC shareholder, using the data on share prices contained in the proxy statement, would have calculated the premium at 27 percent on TSC preferred and 22 percent on TSC common; the data supplied to TSC's management by its investment bankers, based on more current share prices, indicated a premium of 19 percent on TSC preferred and 14 percent on TSC common. Northway argued that the proxy statement should have included the data supplied to TSC's management. The district court denied Northway's motion for summary judgment, and the Court of Appeals for the Seventh Circuit reversed and granted summary judgment for Northway on the § 14 claim. The Supreme Court reversed and said that it was error to hold as a matter of law that the failure to clarify "substantial" was a material omission. "These are questions we think best left to the trier of fact." *Id.* at 426 U.S. 460, at 96 S.Ct. 2138.

Here Judge Owen, after a seven-day trial, found that the proxy statement adequately disclosed that the proceeds of the Buckingham sale were "subject to any appropriate use management might have for it."

Page 3 of the proxy statement says that Glen Alden in the spring of 1971 had $47

---

**11.** Appellees claim that a registration statement would have to be filed, pursuant to § 5 of the Securities Act of 1933, 15 U.S.C. § 77e.

**12.** Part of the transfer occurred via the purchase of $10 million of Glen Alden debentures by Schenley between May 1971 and December 1972 and part via the payment of $26 million in dividends by Schenley in 1972 and 1973.

million of "current maturities of Long-term debt" and that "a substantial portion of the proceeds of the recent sale of Schenley's subsidiary, The Buckingham Corporation . . . . will initially be added to Glen Alden's general working capital and will provide a source of payment of current maturities of Glen Alden's long-term debt." This is not a case where the proxy statement misleads shareholders by giving one purpose when in fact there are several. *Galfand v. Chestnutt Corp.*, 545 F.2d 807, 813 (2d Cir. 1976). Appellants Voege and Tunmore concede (Brief for Appellants at 33) that the proxy statement indicates that the sole purpose of the merger is to transfer funds from Schenley to Glen Alden.

The proxy statement makes it clear that at least $47 million will be transferred. Bearing in mind that "[t]he issue of materiality may be characterized as a mixed question of law and fact," *TSC Industries, Inc. v. Northway, Inc., supra*, 426 U.S. 450, 96 S.Ct. 2133, we conclude that under § 14 there was no requirement that the appellees further clarify the meaning of a "substantial" transfer.

### C.

■ Appellants claim that the proxy statement failed to indicate that Schenley had "approximately $140 million of surplus cash, i. e., liquid assets not needed for the operation of Schenley's business."[13] (Brief for Appellant Cole at 3). They claim that if the proxy statement had revealed the existence of this "surplus cash," they would have sought appraisal of their shares. Appellees argue that the concept of "surplus cash" is tenuous and that even under the appellants' definition there was much less than $140 million in "surplus cash."

Judge Owen, having heard the testimony of appellants' expert, found that "surplus cash" is merely a "label" applied by appellants to those funds which Schenley's management intended to transfer to Glen Alden because they were not needed for the day-to-day operation of Schenley.

Page 3 of the proxy statement says that at least $47 million of Schenley's funds would be transferred (provide a source for payment) immediately to Glen Alden. The financial tables at pages 12 and 26 of the proxy statement indicate that Glen Alden planned to issue about $102 million of debentures as part of the merger. Section 1.3(b) of the Plan and Agreement of Reorganization, Exhibit A of the proxy statement, says that one possibility is for Schenley to purchase for cash these Glen Alden debentures.[14] A shareholder could have reasonably concluded from this information that as of May 21, 1971 management had decided that Schenley had "surplus cash" of between $47 million and $102 million.[15]

---

13. Appellant Cole also claims that the proxy statement should have shown the amount of cash generated by Schenley between May 31, 1968 and May 31, 1971. Glen Alden acquired control of Schenley in August 1968. Page F–27 of the proxy statement shows that Schenley's holdings of cash, certificates of deposit, and marketable securities increased by about $20 million between August 31, 1968 and December 31, 1970; Schenley's current liabilities· decreased by about $18 million during this period.

Appellants do not deny that the proxy statement, by showing Schenley's balance sheet for December 31, 1969 and December 31, 1970, complied with the SEC rules. We consider appellant Cole's claim to be part of appellants' broader claim that the proxy statement did not adequately reveal Schenley's cash position at the time of the merger.

14. The other possibility is for Glen Alden to deliver the debentures and $17 million cash to Franklin National Bank, which would exchange the debentures and cash for the Schenley shares owned by the minority shareholders.

15. In fact Schenley in June 1971 purchased, for about $81 million, Glen Alden debentures whose face value was $102 million.

Note 5 of the consolidated financial statement of Schenley, which appears at page F–30 of the proxy statement, says that under agreements with various insurance companies Schenley is restricted, as at December 31, 1970, to about $80 million for payment of dividends and the acquisition of Schenley capital stock. On June 7, 1971 Schenley received permission from Prudential Insurance Company to spend a maximum of $115 million to purchase Glen Alden debentures. Since a Schenley shareholder could have reasonably learned from the May 21, 1971 proxy statement that Schenley might purchase up to $102 million of Glen Alden debentures, appellees were not required to supplement the proxy statement with a statement concerning this agreement with Prudential.

Appellants do not deny that management could not decide precisely how much cash would be transferred until it knew how many shareholders would exercise their right of appraisal. By the time of the trial of this case, in October 1975, about $75 million had been transferred from Schenley to Glen Alden as payment for the debentures.

Appellants note that Rosenstiel, who still owned 80,000 shares of preferred stock of Schenley, and Milton Nauheim, a Schenley director until 1968 and an owner of 15,000 shares of common stock of Schenley, sought appraisal. Appellants argue that this decision shows that the proxy statement was inadequate. This argument ignores the fact that, according to appellant Cole (Reply Brief for Appellant Cole at 7), owners of about 910,000 shares of common and preferred stock initially objected to the merger and sought appraisal. On this record we assume that many of the owners of these shares, other than Rosenstiel and Nauheim, were neither former Schenley insiders nor investment analysts.

While the proxy statement did not allow the shareholder to make a precise estimate of the value of a share of Schenley stock, it did give the shareholder enough information to decide whether to accept the Glen Alden offer, to seek appraisal, or to try to

enjoin the merger. Page 15 of the proxy statement shows that the book value of Schenley's common stock (assuming full conversion of the preference stock and adjusting for the sale of Buckingham) was $40.44. As noted *supra*, the fair market value of the Glen Alden offer was $29 per share of common stock and $26.10 per share of preferred stock.[16]

We conclude that the proxy statement adequately disclosed that amount of Schenley's liquid assets that management felt was not needed for the operation of Schenley's business.

We have carefully considered appellants' other claims that the proxy statement violates § 14 and find no merit in any of them.[17] The proxy statement disclosed the essential facts pertaining to the merger and contained no misrepresentations of material facts. We hold that there was no violation of § 14 of the Securities Exchange Act of 1934.

### III.

Appellants claim that the appellees breached their fiduciary duty to the minority shareholders of Schenley when they consummated the merger, and that this breach constitutes a violation of § 10(b) of the 1934 Act. In the absence of a finding that there has been a material misrep-

---

**16.** The market price on May 20, 1971 was $27.75 per share of common stock and $24.50 per share of preferred stock.

**17.** Appellants Voege and Tunmore, for example, claim (Brief for Appellants at 3–4), "the defendants violated Rules 10b–5 and 14 of the 1934 Act by inducing the Schenley minority stockholders to endorse and surrender their Schenley common stock certificates in exchange for cash and redeemable Glen Alden debentures (i) by false representations that upon the consummation of the merger they were required to do so as a matter of law and (ii) by failing to reveal that such stockholders were not legally obligated to make such exchange. . . ." Pages 6 and 7 of the proxy statement give an adequate disclosure of the shareholders' right of appraisal. Appellant Cole concedes (Reply Brief for Appellant Cole at 7) that initially the owners of about 910,000 shares of common and preferred stock did seek appraisal. The owners of about 200,000 shares eventually obtained appraisal, *supra*, n.7. We

are concerned here solely with the issue of disclosure and do not intimate any views on whether the right to appraisal under current Delaware law gives adequate protection to minority shareholders.

Appellant Cole, for example, notes that Note D to the Glen Alden financial statement (p. F–13 of the proxy statement) says that Glen Alden's management "recognizes" that the "value" of the Schenley shares owned by Glen Alden has not declined since 1968. Cole argues (Reply Brief for Appellant Cole at 5) that the proxy statement did not adequately reveal that the 1971 Glen Alden offer had a much lower value than the 1968 offer. Page 4 of the proxy statement, however, says "[t]he consideration to be received by the holders of Schenley Common Stock and Schenley $1.40 Preferred Stock in the proposed reorganization is substantially less than that paid by Glen Alden in 1968 for the Schenley Common Stock currently owned by it."

resentation or a failure to disclose material facts this claim must fail. *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). As the Court stated in *Santa Fe,*

> No doubt Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices. But we do not think it would have chosen this "term of art" if it had meant to bring within the scope of § 10(b) instances of corporate mismanagement such as this, in which the essence of the complaint is that shareholders were treated unfairly by a fiduciary.
>
> \*   \*   \*   \*   \*   \*
>
> [T]he Court repeatedly has described the "fundamental purpose" of the Act as implementing a "philosophy of full disclosure"; once full and fair disclosure has occurred, the fairness of the terms of the transaction is at most a tangential concern of the statute.

*Id.* at 477, 97 S.Ct. at 1302. Corporate conduct such as is involved in mergers, tender offers, and liquidations and abuses related to such conduct, has traditionally been left to state regulation. We agree that "there may well be a need for uniform federal fiduciary standards to govern mergers. . . ." *id.* at 479–480, 97 S.Ct. at 1304, but those standards will have to be supplied by legislation rather than through judicial extensions of § 10(b) and Rule 10b–5.

### IV.

During the early phases of trial, Judge Owen decided that he would not permit the introduction of evidence which related solely to Count II, unfairness of the merger under Delaware law. Appellants allege that the reason for his refusal to entertain the state claim was the trial court's mistaken view that it was bound by the state court decisions in *David J. Greene & Co. v. Schenley Industries, Inc.,* 281 A.2d 30 (Del. Ch.1971) and by Judge Lasker's decision in *Voege v. Smith,* 329 F.Supp. 180 (S.D.N.Y. 1971). In neither of these cases had there been a finding of unfairness.

The record does not support appellants' claim. Judge Owen, as a matter of comity, exercised his discretion not to entertain pendent state claims. At trial, when appellants' lawyer urged that the court consider the pendent claim, Judge Owen said,

> It seems to me that where this Court has denied a preliminary injunction, where a court in Delaware has made a finding that the terms were not unfair, that it is inappropriate for this Court *as a matter of discretion* to relitigate the fairness issue as a fairness issue and this leaves in clear outline the disclosure case.
> . . . (emphasis added)

(Appendix at 348.) He later reiterated his view that the exercise of pendent jurisdiction was a matter for the court's discretion, citing *United Mine Workers v. Gibbs,* 383 U.S. 715, 725–26, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

Cole, the Stillers, Voege and Tunmore appeal from the dismissal of Count II of the complaint. Only Cole invokes diversity jurisdiction. As we noted above, the consolidation of these actions under Rule 42, Fed. R.Civ.P., does not merge the separate actions.

█ We find no abuse of discretion in the dismissal of the pendent claims as to the Stillers, Voege and Tunmore. There had already been extensive state litigation involving the same issues and some of the same parties and the issues were peculiarly matters of state policy. *United Mine Workers v. Gibbs, supra,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218; *Locafrance U.S. Corporation v. Intermodal Systems Leasing, Inc.,* 558 F.2d 1113, 1116 (2d Cir. 1977).

█ There was diversity jurisdiction as to Cole and the court should have considered Cole's state claim.

### V.

Appellants Voege and Tunmore claim that as holders of Schenley common stock they are third party beneficiaries of an agreement entered into between Glen Alden and the Rosenstiel group in March 1968. This agreement provided that other holders

of Schenley common would be afforded an opportunity to sell their shares to Glen Alden for a total consideration comparable to or more favorable than the $53.33 paid to the Rosenstiel group. Pursuant to this agreement, Glen Alden made an exchange offer to common stockholders on August 8, 1968 for $58.66⅔ per share. The offer stated that it would expire on August 30, 1968 unless extended.[18] Shareholders were notified on September 9 that there had been no extension.[19] The August offer was accompanied by the following statement:

> After completion of the Exchange Offer, Glen Alden may (subject to future conditions) make a further tender offer to the remaining holders of Schenley Common Stock or propose to combine Glen Alden and Schenley. In connection with any such further tender offer or combination, the consideration to be received by the holders of Schenley Common Stock who have not accepted the Exchange Offer may be more than, less than, or the same as that provided in the Exchange Offer.

August 8 Prospectus, p. 7. Appellants maintain that the 1968 offer continues to be in effect. They allege further that there has been no substantial change in Schenley's business prospects since 1968 and that it is therefore unfair to offer less per share as part of the merger terms than the $58 per share at which Glen Alden valued Schenley in 1968. These arguments are without merit.

The August 1968 exchange offer by Glen Alden to Schenley stockholders fulfilled Glen Alden's obligations under its March 1968 agreement with Rosenstiel. Glen Alden was under no obligation to keep the offer open indefinitely. The argument that the value of the merger offer is too low is independent of the third party beneficiary claim, and goes to the fairness of the tender offer, a claim for which the sole

remedy in Delaware, absent fraud or blatant overreaching, is appraisal. *David J. Greene & Co. v. Schenley, supra,* 281 A.2d 35. The amounts paid when Glen Alden obtained control in 1968 made the 1971 merger price look quite inadequate, but they were set at the time of a battle for control, were available to the minority at the time, are not conclusive as to values some years later, and could of course be argued at appraisal proceedings. Shareholders received unambiguous notice that if they declined the offer they might subsequently be faced with a tender offer at a possibly lower price. The district court properly dismissed the third party beneficiary claim on the merits and left appellants to their state court remedies on the issue of unfairness.[20]

Remanded to the United States District Court for the Southern District of New York for further consideration in the light of the decision of the Supreme Court of Delaware in *Singer v. The Magnavox Company,* No. 289 (1976) dated September 23, 1977.

---

18. August 8, 1968 Prospectus, p. 4.

19. September 9, 1968 Prospectus.

20. The Voege appellants also seek to have the judgment appealed from amended pursuant to

Rule 54(c), Fed.R.Civ.P., to award counsel fees to their attorney for increasing the monetary recovery of minority shareholders. Since this issue was not raised below, we do not address it on appeal.