Harry A. DOWER, Robert F. Hunsicker and Harry A. Dower, Trustees, and Donald K. Hagar

v.

MOSSER INDUSTRIES, INC. and Ecolaire, Inc.

Civ. A. No. 77–4396.

United States District Court, E. D. Pennsylvania.

April 29, 1980.

---

H. A. Dower, Allentown, Pa., for plaintiffs.

Brett A. Schlossberg and George J. Miller, Philadelphia, Pa., for defendants.

TROUTMAN, District Judge.

## OPINION

### I

#### Parties

Plaintiffs Harry A. Dower (Dower), Robert F. Hunsicker and Harry A. Dower, trustees of a trust (the Trust) and Donald K. Hagar (Hagar) bring this action solely on their own behalf, against defendants Mosser Industries, Inc. (Mosser) and Ecolaire, Inc. (Ecolaire). The essence of their complaint, as amended, is that defendants violated § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) (the 1934 Act) and breached fiduciary duties owed plaintiffs under Pennsylvania law in connection with a merger by which Ecolaire became the sole shareholder of Mosser and that plaintiffs, who were minority shareholders, were "squeezed out". The case was tried by the Court without a jury.

### II

#### Jurisdiction

The Court has jurisdiction over the federal law claims pursuant to 28 U.S.C. § 1331 and § 10(b) of the 1934 Act. The Court assumes pendent jurisdiction over the related state law claims. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187 (3d Cir. 1976).

## III

### History

Mosser is a Pennsylvania corporation which manufactures and markets lines of butterfly valves and industrial dampers. In late 1977 Mosser had outstanding common stock and warrants to purchase common stock which were due to expire on December 31, 1977. Upon the payment of $4.00 each warrant was convertible into one share of common stock. As of November 3, 1977, plaintiffs and Ecolaire owned the following Mosser securities:

| | | |
|---|---|---|
| Dower | 2,500 shares | 1,400 warrants |
| Trust | 12,500 shares | 3,750 warrants |
| Hagar | 0 shares | 100 warrants |
| Ecolaire | 421,835 shares | 306292.5 warrants |

The remaining 16,250 shares and 3,500 warrants were owned by a small number of other minority equity holders who are not parties to this litigation. Ecolaire's ownership represented approximately 93.1% of the outstanding stock and 97.1% of the outstanding warrants. During the relevant period, Ecolaire was in effective control of Mosser.

Late in the spring of 1977 Mosser realized it was outgrowing its manufacturing facilities. After considering the problem, Mosser's Board of Directors, in September of 1977, preliminarily approved plans for the construction of a new facility expected to cost in the neighborhood of $6,300,000.00. Mosser entered into an agreement to purchase land for the facility.

Mosser required financing for a substantial portion of the anticipated cost of the project. Preliminary discussions with a local Allentown bank indicated that for Mosser to be able to obtain the financing, Ecolaire would have to guarantee all or a significant portion of the debt to be incurred. During an Ecolaire board meeting held on November 10, 1977 Ecolaire's directors considered the magnitude of its anticipated guarantee and decided that Ecolaire should not be expected to share the benefits of the proposed expansion with Mosser's minority shareholders who would not share in the risk of the financing guarantee. Ecolaire's senior executives then were directed to prepare a plan to liquidate the minority interest prior to pursuing the Mosser project further.

In the meantime, on November 3, 1977, Mosser sent out to its warrantholders (including plaintiffs) a package of documents designed to assist them with their decision whether or not to exercise their warrants (the November disclosures). The following is a summary of the included documents:

(a) An information statement concerning the company which included detailed facts about:

(i) Mosser's history and its business;

(ii) Mosser's products and its markets;

(iii) its technical staff, warranties and the amount, the duration of, and the reasons for backlogs in orders;

(iv) the company's existing facilities and an explanation of the proposed new facility as it was then contemplated;

(v) Mosser's directors and officers and the remuneration of officers, including incentive compensation;

(vi) its transactions with Ecolaire and its subsidiaries including the management and administrative services it obtained from Ecolaire;

(vii) its outstanding common stock and warrants to purchase common stock;

(viii) the book value of its common stock ($6.59 per share assuming exercise of all warrants, which in fact occurred);

(ix) litigation with Damper Designs, Inc., a competitor owned by a former officer of Mosser (plaintiff Hagar);

(x) restrictions on the resale of Mosser securities.

(b) a copy of Mosser's certified financial statements for 1974, 1975, and 1976;

(c) a copy of Mosser's balance sheet as of September 30, 1977;

(d) comparative statements of income and of changes in financial position for the nine months ending September 30, 1976 and September 30, 1977.

The disclosure documents were up to date and comprehensive as of the date they were

sent out. The information they contained was accurate and fairly portrayed. As of that date, it provided to warrantholders all of the information necessary for a reasonable and prudent investor to make an informed decision with respect to exercising the warrants.

In early December of 1977 Ecolaire's president, Robert E. Delaney, presented to Mosser's board a Plan of Merger which provided for the merger of NMI, Inc. (NMI) into Mosser. NMI was a shell corporation owned by Ecolaire which was created to effectuate the Plan of Merger. The Plan provided that upon the effective date of the merger, Ecolaire would become the sole shareholder of Mosser and all outstanding shares owned by shareholders other than Ecolaire would be converted into the right to receive $8.00 in cash per share. After detailed discussion by Mosser's board of the terms of the merger and how the $8.00 per share price was derived, the Plan was approved.

On December 8, 1977, Mosser sent to all of its shareholders and warrantholders, including plaintiffs, a package of documents concerning the proposed Plan of Merger (the December disclosures). Included were the following documents:

(a) Notice of Special Meeting to be held January 4, 1978 to vote on the proposed Plan of Merger;

(b) a letter stating that Ecolaire would become Mosser's sole shareholder and describing, *inter alia*, the reasons for the proposed merger, how the price of $8.00 per share was determined, the details of the agreement to purchase land for Mosser's proposed expansion, dissenter's rights under Pennsylvania law, and the exercise of outstanding warrants;

(c) a copy of the Plan of Merger;

(d) a copy of §§ 908 A and 515 of the Pennsylvania Business Corporation Law which, as stated in the Notice of Special Meeting, set forth the rights of dissenting shareholders and procedures to be followed by holders of the common stock of the Company, and warrantholders who exercise their warrants, who wished to exercise such dissenter's rights;

(e) a copy of the shareholder resolutions to be adopted.

Over roughly a three-month period prior to the filing of this lawsuit on December 27, 1977, plaintiff Dower, on behalf of all the plaintiffs, demanded additional information, including the following:

(a) All financial information which had been given to Ecolaire;

(b) all projections of sales and profits, including a five-year plan prepared by Mosser which contained such projections;

(c) a complete analysis of the backlog of all orders including copies of purchase contracts, the method of arriving at the bid price, the quoted price for the sale of items and anticipated profits;

(d) Mosser's plans for relocation, new plants and machinery and equipment, the capitalization requirements for these plans, what new products the company plans to develop and what new markets it plans to enter.

These communications, including plaintiffs' telephone contact with Mosser, manifested an intention on the part of plaintiffs to bring suit if their demands were not met.

After consultation with outside legal counsel, who advised that the production of such information was not legally required, Mosser refused plaintiffs' demands and this lawsuit followed. After an evidentiary hearing, we entered an order denying plaintiffs' motion for a preliminary injunction, but gave plaintiffs more time to make their investment decision by extending the expiration date of the warrants until noon on January 16, 1978, with consummation of the merger not to occur before that time.

Prior to consummation of the merger on January 16, 1978, all minority shareholders, including plaintiffs, exercised their warrants. The minority shareholders not a party to this suit and the Trust, in accordance with the Plan of Merger, elected to receive $8.00 per share for their stock. The re-

maining plaintiffs elected dissenter's rights pursuant to §§ 908 A and 515 of the Pennsylvania Business Corporation Law. An appraisal proceeding in the Court of Common Pleas of Lehigh County, Pennsylvania, is pending in connection therewith.

## IV

### Plaintiffs' Contentions

Plaintiffs contend that the November and December disclosures contain material omissions and misrepresentations which had or would have had significant impact upon their investment decisions with respect both to exercise of the warrants and to the merger. As a threshold matter, it is apparent that given the disclosures sought by the plaintiffs, all warrants would have been exercised, as in fact they actually were. This conclusion is obvious because Mosser clearly was solvent (as conceded by plaintiffs) and the Plan of Merger entitled the warrantholder to exercise each warrant for $4.00 while becoming entitled to receive for the resultant share of common stock $8.00. Even plaintiffs' experts, about whom more will be said later, essentially agreed.[1]

The plaintiffs also contend that the alleged omissions and misrepresentations are also claimed to constitute actionable breaches of state-law imposed fiduciary duties. Plaintiffs further alleged that state law has also been violated because the merger was fraudulent and fundamentally unfair. The

federal claims and the state claims will be considered in turn.

## V

### Federal Securities Law Claims

A. Whether a Cause of Action has been Stated

At trial and in their post-trial brief defendants vigorously argued that plaintiffs have failed to state a cause of action, citing *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) and its progeny.[2] Defendants assert that if we strip away the rhetoric, plaintiffs are merely superimposing a gloss of deception upon what are really claims of breaches of fiduciary duty. If so, of course, the holding of *Santa Fe* would bar the assumption of subject matter jurisdiction by this Court. However, we disagree with defendants' categorization of plaintiffs' claims. Plaintiffs go beyond mere allegations of breaches of fiduciary duty. They plead in their complaint, as amended, that defendants' disclosure documents were the subject of material omissions and misrepresentations which compromised plaintiffs' ability to make investment decisions, especially the decision whether or not to pursue available state remedies. Such claims fall within the ambit of § 10(b) of the 1934 Act as interpreted in this Circuit, *Healey v. Catalyst Recovery of Pennsylvania, Inc.,* 616 F.2d 641 (3d Cir. 1980),[3] and other circuits. *See, e. g., Goldberg v. Meridor,* 567 F.2d 209 (2d

---

1. Plaintiffs' first expert, Carl R. Beidleman concluded that on the basis of the November and December disclosure documents he would have exercised his warrants regardless of whether the stock actually was worth $8.00 or more or less than $8.00 per share. He also acknowledged that the omissions and misrepresentations alleged by plaintiffs would not have affected the decision of a reasonable, prudent investor to exercise the warrants.

Plaintiffs' second expert, Thomas Bogert admitted that there would not be any reason for a minority warrantholder not to exercise his warrants if he pays $4.00 to exercise the warrant and is guaranteed of getting back at least $8.00. He further admitted that even were receipt of $8.00 (through the Plan of Merger) not the only alternative (presumably challenging the merger or electing dissenters' rights) he still could ex-

ercise the warrants and make up his mind what he wanted to do after that.

2. *See e. g., Golub v. P.P.D. Corp.,* 576 F.2d 759 (8th Cir. 1978); *Browning Debenture Holders' Comm. v. DASA Corp.,* 560 F.2d 1078 (2d Cir. 1977); *Biesenbach v. Guenther,* 446 F.Supp. 98 (E.D.Pa.), *aff'd,* 588 F.2d 400 (3d Cir. 1978); *Lavin v. Data Systems Analysts, Inc.,* 443 F.Supp. 104 (E.D.Pa.1977), *aff'd,* 578 F.2d 1374 (3d Cir. 1978).

3. Although we are somewhat troubled by the concerns raised in Judge Aldisert's dissent in *Healey, supra,* that extension of the reach of the federal securities laws to cases of this nature has a potential for unwarranted interference with corporate state law, we regard ourselves as bound by the reasoning set forth by the majority in *Healey.*

Cir. 1977), *cert. denied,* 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978); *Kidwell ex rel. Pefold v. Meikle,* 597 F.2d 1273 (9th Cir. 1979); *Alabama Farm Bureau Mutual Casualty Co. v. American Fidelity Life Insurance Co.,* 606 F.2d 602 (5th Cir. 1979). Accordingly, plaintiffs have properly stated a cause of action under § 10(b) of the 1934 Act.

### B. The Elements of a § 10(b) Cause of Action

■■■ To prove a cause of action for damages under § 10(b) of the 1934 Act, certain elements must be established. First, the violation must be in connection with the purchase for sale of a security. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). There is no question here that exercise of the warrants and implementation of the Plan of Merger satisfies this requirement.[4]

The second requisite element is that the claimed omissions and misrepresentations must be material in the context of the transactions at issue. The United States Supreme Court's most recent analysis of the materiality requirement of § 14(a) of the 1934 Act in *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) has been held applicable to the materiality requirement of § 10(b).[5] In *TSC Industries* the Court held:

An omitted fact is material if there is substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. This standard is fully consistent with *Mills'* [*Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593] general description of materiality as a requirement that "the

defect have a significant *propensity* to affect the voting process". It does not require proof of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. 426 U.S. at 449, 96 S.Ct. at 2132 (footnote omitted) (emphasis in original).

Our analysis under § 10(b) of the 1934 Act is thus directed toward ascertaining whether there has been a significant misrepresentation or omission with respect to the investment decisions to be made.

We are also mindful of the Supreme Court's caution that:

. . . [a] cause of action cannot be established by proof of a defect so trivial, or so unrelated to the transaction for which approval is sought, . . . 426 U.S. at 447, 96 S.Ct. at 2131.

. . . [t]he disclosure policy embodied in the proxy regulations is not without limit. [citations omitted] Some information is of such dubious significance that insistence on its disclosure may accomplish more harm than good. 426 U.S. at 448, 96 S.Ct. at 2132.

The third requirement is that there be a causal relationship between the alleged material omissions and misrepresentations and the alleged injury. The Supreme Court articulated the applicable standard in *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 153, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972):

---

4. All of the plaintiffs exercised their warrants, thus "purchasing" Mosser common stock at $4.00 per share. With respect to the merger, the Trust tendered its stock, thus effecting a sale. As to plaintiffs Dower and Hagar who were non-tendering holders of common stock, the "forced sellers" doctrine is applicable. *See e. g., Vine v. Beneficial Finance Co.,* 374 F.2d 627, 633–36 (2d Cir.), *cert. denied,* 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967); *Valente v. Pepsico, Inc.,* 454 F.Supp. 1228, 1236–37

(D.Del.1978); 2 A. Bromberg *Securities Law;* Fraud § 6.3 at 122.17 (1977).

5. *See e. g., Steadman v. S.E.C.,* 603 F.2d 1126 (5th Cir. 1979); *Goldberg v. Meridor, supra; Alton Box Board Co. v. Goldman, Sachs & Co.,* 560 F.2d 916 (8th Cir. 1977); *Wright v. Heizer Corp.,* 560 F.2d 236 (7th Cir. 1977), *cert. denied,* 434 U.S. 1066, 98 S.Ct. 1243, 55 L.Ed.2d 767 (1978).

Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recover. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. [citations omitted]. This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact.[6]

In *Rochez Bros., Inc. v. Rhoades*, 491 F.2d 402, 410 (3d Cir. 1974), the Circuit Court has read this as a rebuttable presumption:

We do not read this decision to say that the question of reliance *vel non* may not be considered at all in a non-disclosure case, but only that proof of reliance is not required for recovery. If defendant is able to demonstrate that there was clearly no reliance, that is, that even if the material facts had been disclosed, plaintiff's decision as to the transaction would not have been different from what it was, then the non-disclosure cannot be said to have caused the subsequent loss and under the ordinary principles of the law of fraud, recovery should be denied. . . . However, in light of the Supreme Court's holding in *Affiliated Ute*, the burden of proof rests squarely upon defendant to establish the "non-reliance" of plaintiff.

*See also Thomas v. Duralite Co.*, 524 F.2d 577 (3d Cir. 1975); *Carras v. Burns*, 516 F.2d 251 (4th Cir. 1975).

In a case such as this, there is a very real issue whether, in view of the fact that Ecolaire controlled enough votes to effectuate the merger without support from the minority, causation could be established. The Supreme Court specifically left this question open in *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 385 n.7, 90 S.Ct. 616, 622 n.7, 24 L.Ed.2d 593 (1970):

We need not decide in this case whether causation could be shown where the management controls a sufficient number of

shares to approve the transaction without any votes from the minority. Even in that situation, if the management finds it necessary for legal or practical reasons to solicit proxies from minority shareholders, at least one court has held that the proxy solicitation might be sufficiently related to the merger to satisfy the causation requirement . . . .

Plaintiffs allege that there is a causal relationship because the claimed omissions and misrepresentations caused them to seek injunctive relief to prevent the merger and otherwise affected their options with respect to the merger. We think this was sufficient, at least to raise a question of fact to be decided at time of trial. The majority of courts which have considered this issue have reached the same conclusion. *See Cole v. Schenley Industries, Inc.*, 563 F.2d 35 (2d Cir. 1977); *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374 (2d Cir. 1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975); *Swanson v. American Consumer Industries, Inc.*, 415 F.2d 1326 (7th Cir. 1969); *Valente v. Pepsico, Inc.*, 454 F.Supp. 1228 (D.Del.1978). *But see Wright v. Heizer Corp., supra; Barnett v. Anaconda Co.*, 238 F.Supp. 766 (S.D.N.Y.1965). In any event, "any problems of causation are adequately disposed of by applying objective materiality criteria". *Healey v. Catalyst Recovery of Pennsylvania, Inc.*, at 649.

The fourth element which must be established as part of a § 10(b) claim is a showing of scienter on the part of the alleged violator. The Supreme Court in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193–94, 96 S.Ct. 1375, 1881–82, 47 L.Ed.2d 668 (1976) held that "scienter", a mental state embracing intent to deceive, manipulate, or defraud, is a necessary element of a § 10(b) claim. The court specifically left undecided whether reckless behavior could establish the requisite scienter.

The Third Circuit held in *Coleco Industries, Inc. v. Berman*, 567 F.2d 569, 574 (3d Cir. 1977), *cert. denied*, 439 U.S. 830, 99 S.Ct. 106, 58 L.Ed.2d 124 (1978) that the scienter requirement could be satisfied by:

---

**6.** As previously noted, the Supreme Court later revised the test for materiality in *TSC Indus-* *tries, Inc. v. Northway*, 426 U.S. at 449, 96 S.Ct. at 2132.

a misrepresentation so recklessly made that the culpability attaching to such reckless conduct closely approaches that which attaches to conscious deception. (quoting Judge Huyett's district court opinion, 423 F.Supp. 274, 296, (E.D.Pa. 1976).)

Because of the absence of any conceivable § 10(b) cause of action in that case, the court in *Coleco* did not define a legal standard for recklessness. However, in *McLean v. Alexander*, 599 F.2d 1190, 1197 (3d Cir. 1979), this Circuit adopted the legal standard previously applied in the Seventh Circuit:

> [r]eckless conduct may be defined as . . highly unreasonable [conduct], involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*McLean* also held that the burden of proof of the requisite scienter lies with the plaintiff. *McLean v. Alexander*, 599 F.2d at 1196–97. The *McLean* holding recently was reaffirmed by the Third Circuit in *Healey v. Catalyst Recovery of Pennsylvania, Inc.*, supra.

C. The Alleged Omissions and Misrepresentations

1. Whether Mosser executives sold their stock to Ecolaire at a price in excess of $8.00 per share.

■ In the disclosure documents given the minority in November, 1977 appears the following statement:

*Absence of Active Market for Common Stock*

There is no active market for the common stock of the Company [Mosser]. The only recent transaction involving sale of shares of the Company's common stock of which the Company is aware was the purchase by Ecolaire in July 1977 from two officers of the Company of their shares of common stock and warrants at an effective price per share of common stock of $8.00.

Plaintiffs do not quarrel with the statements that there was no active market for the stock and that the only transaction involving the stock known to Mosser was Ecolaire's purchase from two of Mosser's officers in July, 1977. Rather, the heart of plaintiffs' allegations is their claim that these officers (the president, Lloyd G. Parsons and the vice president, Francis A. Curry) received more than $8.00 per share and that this fact was not disclosed in the information provided to the minority. The Court has very carefully considered this claim and, after weighing the evidence, finds that Parsons and Curry did not receive more than $8.00 per share for their stock.

Plaintiffs' argument that these officers received more than $8.00 per share rests primarily on the fact that at approximately the same time, they received a substantial award of Ecolaire "phantom stock units". Ecolaire "phantom stock units" were and apparently are given in varying amounts to executives of Ecolaire and its subsidiaries, including Mosser, as an aspect and part of their executive compensation. Since they have no value when given but acquire value only with increases in the book value of Ecolaire, they are intended as an incentive to improve executive performance. Plaintiffs argue that since Parsons and Curry had never previously received such a large award and since Ecolaire did not customarily award phantom stock units in the middle of the year, the real reason for such an award was to hide part of the consideration paid for their stock.

Plaintiffs overlook, however, several important facts which cast an entirely different light on the matter and lead us to a contrary conclusion. First, the merger had not even been considered at the time Parsons and Curry sold their stock to Mosser. Plaintiffs have established no reason at trial why defendants would want to conceal the amount paid to Parsons and Curry at that point in time. Uncontradicted evidence at trial showed that although there was a suggestion by Ecolaire's vice presi-

dent William A. Walker that payment for the stock be partly in cash and partly in Ecolaire "phantom stock units", Ecolaire's president, Robert Delaney, flatly rejected it by March, 1977 because the compensation would have been excessive. Furthermore, Parsons and Curry themselves never requested "phantom stock units", only cash. After arms length negotiations, the price ultimately agreed upon was $8.00 per share. The contracts of purchase reflect this payment as the only consideration.

Additionally, there is no doubt of Delaney's very real concern that, with the loss of their equity interest in Mosser, Parsons and Curry would no longer have had the same incentive to remain with the company. Prior to July, 1977, Parsons and Curry had not received the same number of "phantom stock units" as had other similarly placed executives in the Ecolaire organization. Yet Parsons and Curry were the two key executives of Mosser who "made the company go". Delaney's testimony clearly established that, with the loss of their equity interest in Mosser, he considered it necessary to provide Parsons and Curry with a substitute incentive to remain with Mosser.

Considering their key positions in Mosser, the fact that the July, 1977 award of units brought Parsons' and Curry's holdings of units only up to the level of other similarly situated executives, and the fact that the merger had not even been considered at that time, we conclude that the awards cannot be considered to have been in payment for their stock. We find that the awards were made as an aspect of their executive compensation solely as an incentive to have them remain with Mosser and give them an increased stake in the future of the Ecolaire organization of which Mosser was a part. Accordingly, with respect to Ecolaire's purchase of Parsons' and Curry's Mosser common stock in July, 1977, the disclosures contained no material omission or misrepresentation.

2. Whether the merger was for valid business reasons and was bona fide.

■ Plaintiffs allege that the merger was not undertaken for valid business rea-

sons but rather was fraudulently conceived as an illegal means of "kicking out" the minority. Although this essentially represents a state-law based claim, plaintiffs argue a § 10(b) violation because of defendants' alleged failure to disclose it.

However, the evidence at trial supported defendants' assertion that there was not even consideration of a plan of merger until Ecolaire refused to give an anticipated loan guarantee without full ownership of Mosser. At the time the decision to prepare a plan to liquidate the minority was made, it appeared that the Mosser expansion was necessary and that, because of the cost of the proposed new facility, substantial financing with an anticipated loan guarantee by Ecolaire would be required. It was reasonable and to be expected that the controlling parent was not willing to assume the sole risk of guarantee without the benefits of full ownership. We find that the anticipated loan guarantee was the primary reason for proposal of the plan of merger and that the merger was not fraudulently conceived or consummated for an illegal or improper reason. It is also beyond question that the merger was beneficial to Mosser by facilitating the availability of the financing required for the proposed expansion. The disclosure materials fairly portrayed the reasons for the merger and, accordingly, there was no violation of § 10(b) of the 1934 Act with respect thereto.

3. The materiality of information not given to the minority.

■■ The letters of plaintiff Dower to Mosser during the period, October to December, 1977, demanded that he be given essentially all of Mosser's corporate records because they were in the possession of or were known to Ecolaire. These letters and his telephone conversations with Mosser also manifested a clear intention that a lawsuit would follow were the information not produced. Plaintiffs implicitly argue that any information given to a controlling parent which is not given to the minority constitutes a violation of § 10(b). This

premise simply is not accurate. Whatever may be the rights of a minority shareholder under state law to examine a corporation's books (which are limited—*see e. g. Hagy v. Premier Mfg. Corp.*, 404 Pa. 330, 172 A.2d 283 (1961)), the test under the federal securities laws is whether the non-disclosures or misrepresentations were material in the context of the purchase or sales transactions at issue.

The list of demands made by plaintiffs included such things as copies of purchase contracts, the method of arriving at the bid price and the quoted price for the sale of items. Perhaps unique to this case is the fact that plaintiff Hagar is a competitor of Mosser's and is represented by plaintiff Dower. In the light of such fact, it is highly unlikely that production of such information could be compelled even under state law. *See Hagy v. Premier Mfg. Corp., supra.* In any event, it is obvious that such information is not and was not material to the investment decisions made and to be made by plaintiffs. After hearing the testimony and reviewing plaintiffs' communications to Mosser, the Court, without making any accusations, has serious doubts that the information demanded was sought in good faith. In any event, it was and is apparent to the Court and we find and conclude that these requests were not necessary to the making of an investment decision or decisions. The testimony of Mr. Dower made abundantly clear plaintiffs' views and conclusions that the stock was worth far in excess of $8.00 per share and that the merger was undertaken solely for the purpose of squeezing out the minority; said conclusions having been reached without the information sought. No acts or omissions by defendants with respect to disclosure would have altered plaintiffs' decision to exercise their warrants, oppose the merger and, except for the Trust, pursue dissenter's rights. The evidence presented at trial has convinced the Court and we conclude that plaintiffs would have followed the course they did regardless of the alleged omissions or misrepresentations by defendants. Accordingly, plaintiffs simply have not acted to their detriment in reliance upon the al-

leged omissions or misrepresentations. *See Chelsea Associates v. Rapanos*, 527 F.2d 1266, 1271 (6th Cir. 1975).

Moreover, none of the additional information demanded by plaintiffs was material with respect to the investment decisions at issue here. The disclosure documents provided detailed facts about most of the areas raised by plaintiffs, including financial information, the business of the company, its backlog of orders, its facilities and plans for expansion and its stock. All of the data which would be of use to an investor in deciding whether to exercise his warrants and whether to accept or reject the Plan of Merger was given to the minority, including plaintiffs. As the Supreme Court made clear in *TSC Industries, Inc. v. Northway, supra*, the scope of materiality does not extend further:

> The potential liability for a . . . violation can be great indeed, and if the standard of materiality is unnecessarily low, not only may the corporation and its management be subjected to liability for insignificant omissions or misstatements, but also management's fear of exposing itself to substantial liability may cause it simply to bury the shareholders in an avalanche of trivial information—a result that is hardly conducive to informed decisionmaking. 426 U.S. at 449, 96 S.Ct. at 2132.

Plaintiffs also complain that they did not receive Mosser's five-year plan which contains profit and loss projections and other future-oriented projections, including a hypothetical acquisition. Plaintiffs assert that Mosser's failure to produce the plan is a violation of § 10(b) of the 1934 Act. To support this position, plaintiffs cite the Security Exchange Commission's "safe harbor" rule, effective July 30, 1979, which permits *voluntary* disclosure of such projections. *See* SEC Release No. 33–6084 (June 25, 1979). Not surprisingly, plaintiffs were unable to point to any case in which projections as to future performance were required to be produced. Neither the courts nor the SEC have ever required disclosure of such future-oriented information. *See*

*Rodman v. Grant Foundation*, 608 F.2d 64, 72 (2d Cir. 1979) ("full factual disclosure need not be embellished with speculative financial predictions"); *Lewis v. Oppenheimer*, 481 F.Supp. 1199 (S.D.N.Y.1979). Indeed, at the time this merger transaction was proposed, the SEC itself refused even to encourage disclosure of such projections:

> It shall be noted, however, that the Commission is neither encouraging nor discouraging the making and filing of projections because of the diversity of the views on the importance and reliability of projections. SEC Release No. 33–5699 (April 23, 1976).

*See also Kohn v. American Metal Climax, Inc.*, 458 F.2d 255, 265 (3d Cir. 1972) ("Ordinarily the SEC and the courts discourage presentations of future earnings, appraised asset valuations and other hypothetical data in proxy materials".).

Plaintiffs argue that because Ecolaire had the future projections, it was a violation of § 10(b) for plaintiffs not to receive it. However, their argument overlooks the fact that the proper test under the securities laws is whether it would have been material to a reasonable shareholder, *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. at 449, 96 S.Ct. at 2132, not whether they *had* it at the time. As conceded by plaintiffs' expert, Mr. Bogert, the disclosure documents themselves suggest that Mosser had a good future, and that on the basis of those documents he was able to conclude that the price per share was undervalued at $8.00. Because of the detailed information contained in the disclosure documents we find that such projections, which were admittedly speculative, would not have been material. Moreover, we note that the test of materiality is with respect to a reasonable shareholder (or investor), not a particular litigant. In light of the detailed factual information disclosed to the minority, we conclude that enforced disclosure of the kind of speculative information demanded by plaintiffs would do more harm than good

to a reasonable shareholder. *Cf. TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. at 448, 96 S.Ct. at 2132.

**4. Other claims asserted by plaintiffs.**

■ Plaintiffs made a series of allegations, several interrelated, concerning conduct by defendants which they claim violated § 10(b) of the 1934 Act. Although the Court has considered each carefully, our findings need only be brief.

Plaintiffs argue that Ecolaire placed a value on the stock in excess of $8.00 per share and that this "fact" was not disclosed. Since they could offer no direct evidence of this, plaintiffs argue through their own rather convoluted calculations which are based solely on financial data contained in the disclosure documents, that the stock is worth more than $8.00 per share. However, these were calculations done by plaintiff Dower, not by defendants. Moreover, direct evidence showed that arms length negotiations between the Mosser's senior officers and Ecolaire, which purchased this stock, resulted in a sales price of $8.00 per share. This is consistent with Mosser's book value, which, with exercise of all the warrants, was $6.59 per share.[7] We find that although plaintiffs may choose to value the stock in a manner different from defendants, there is no evidence from which it reasonably can be inferred that Ecolaire valued Mosser's stock in excess of $8.00 per share. The disclosure documents explain in sufficient detail the method of valuing the stock which was employed by defendants. The law does not require the offeror to engage in the kind of complicated analysis put forth by plaintiffs here. *Cf. Weeks Dredging & Contracting Co. v. American Dredging Co.*, 451 F.Supp. 468, 484 (E.D.Pa. 1978).

The disclosure documents contain the following explanation of the derivation of the per share price of $8.00:

> The price of $8.00 per share was determined by taking into account the book

---

7. The Supreme Court of Pennsylvania has noted that in situations such as here where there is no reliable market for the stock, net asset value must be given significance. *O'Connor Appeal*, 452 Pa. 287, 296, 304 A.2d 694 (1973).

value per share at September 30, 1977, actual per share earnings for the first nine months of 1977, estimated earnings for the last three months of 1977, and a price/earnings multiple of 8 which was based on a review of the price/earnings ratios of companies engaged in businesses similar to that of the Company, but whose shares are publicly traded. In determining the price it was assumed that all outstanding warrants would be exercised.

At trial, Mr. Walker testified that he was the individual who performed this work. We are unimpressed with plaintiffs' allegations that the securities laws require disclosure that Mr. Walker is not a securities analyst or is an outsider, or that he should have used factors other than those he did. What is material to a shareholder is *how* the figure was determined—information which was here clearly set forth in the disclosure documents.

■ Plaintiffs' next allegation concerns defendants' failure to disclose an offer made to the minority but not to plaintiffs. The "offer" was a statement made to the other minority shareholders that if it is determined judicially or otherwise that the stock is worth more than $8.00 per share, they will be paid the difference. The evidence showed, without contradiction, that this offer was made solely because of plaintiffs' manifest intention to sue defendants. Since plaintiffs themselves would be the genesis of any such determination, it is hardly surprising the offer was not made to them. Such conduct does not violate the 1934 Act.

■ Plaintiffs also complain that the disclosure documents contained no reference to self-interest, which allegedly motivated Ecolaire's officers, Delaney and Walker, and Mosser's officers, Parsons and Curry, in pushing the Plan of Merger. The self-interest allegedly arises from the fact

that all of them held Ecolaire phantom stock units at the time the merger transaction was effected. Since Ecolaire, after the merger, would own all of Mosser, thus increasing Ecolaire's net worth, the value of Ecolaire phantom stock units presumably also would increase. However, plaintiffs did not offer any evidence to support either their assumption of increase in net worth or what the extent of such an increase might be. Delaney and Walker, who then owned far more phantom stock than Parsons and Curry, both testified that, until the idea was raised in the courtroom the day they testified, they had never considered it. Delaney also testified that he then performed a calculation which indicated that the effect was so small there was no reason to consider it. The Court finds that no significant self-interest on the part of any officer of Mosser or Ecolaire was established at trial and consequently there was no material omission or misrepresentation with respect thereto.

■ Plaintiffs assert that two additional omissions in the disclosure documents also render them fatally defective. The first is that NMI's status as a wholly-owned "shell" of Ecolaire was not mentioned. There is no dispute between plaintiffs and defendants that NMI did nothing more than function as the vehicle to effectuate the merger. We find that because NMI had no other significance, there was sufficient disclosure concerning the mechanics of the merger. The disclosure documents were explicit that the purpose of the merger was for Ecolaire to become the sole shareholder of Mosser.[8]

■ The other omission pressed by plaintiff is that Envirotech Corporation's offer to purchase voting control of E. J. Lavino & Co. (Lavino) was not disclosed. Lavino is the corporate parent of Ecolaire. Aside from bare speculation as to how Mosser's status might be affected by such a

---

8. Both plaintiffs' experts argued materiality with respect to this issue in terms of whether NMI was an active business. As the parties agree, it was not. Mr. Bogert candidly acknowledged that "disclosure" with respect to a

shell corporation would not matter, nor would the mechanics of the merger, as long as the minority was apprised that their minority interest was being liquidated. Such a disclosure was made here.

development, plaintiffs offered no evidence whatever to support their claim of materiality. We find that an offer to purchase a controlling interest of a twice-removed corporate parent is completely immaterial to minority shareholders faced with the investment decisions at issue here. The inclusion of such information might very well have served only to confuse the minority and, at best, would not have been helpful.

## VI

### State Law Claims

 As noted previously, plaintiffs' claims of defendants' breach of fiduciary duties are bottomed on allegations of fraud and of fundamental unfairness of the merger. After reviewing the documentary evidence and judging the credibility and, where appropriate, the competency of the witnesses, we find neither fraud by defendants nor unfairness in the merger.

Although this opinion otherwise contains more detailed findings of fact (which, of course, also apply with respect to the state law claims) it is helpful to recap several of those findings:

1. The proposed Mosser plant expansion was necessary, as perceived at the time;

2. Required financing contemplated an anticipated loan guarantee by Ecolaire for at least a substantial portion of the loan, which Ecolaire was unwilling to give without full ownership of Mosser;

3. The reason for consideration of a merger was primarily the need for the financing guarantee;

4. The merger was in the best interest of Mosser;

5. Defendants made no material omissions or misrepresentations with respect to the minority and did not engage in fraudulent conduct;

6. The merger was consummated in accordance with the requirements of the Pennsylvania Business Corporation Law;

7. The merger was not fundamentally unfair because it was undertaken for valid business reasons, with full disclosure, and in accordance with applicable law;

8. The derivation of the price per share was adequately explained and is not unreasonable or unfair in light of Mosser's book value and the price/earnings multiple used.

The cases cited by plaintiffs, including, *inter alia, Lebold v. Inland Steel Co.*, 125 F.2d 369 (7th Cir. 1941); *Farris v. Glen Alden Corp.*, 393 Pa. 427, 143 A.2d 25 (1958); and *Weisbecker v. Hosiery Patent*, 356 Pa. 244, 51 A.2d 811 (1947) are largely inapposite because they involved transactions found to have been fraudulent. The Court agrees that Ecolaire had a fiduciary duty to the minority because of its controlling position. However, there has been no breach of that duty here and, consequently, the merger was lawful.

## VII

### Conclusion

Upon review of all of the evidence this Court finds that plaintiffs failed to carry their burden of proof that there were any material omissions or misrepresentations in the disclosure documents given the minority, that defendants possessed scienter or an intent to deceive or defraud, that plaintiffs acted to their detriment upon the alleged omissions and misrepresentations, that defendants breached any fiduciary duties owed to plaintiffs or that the merger was fraudulent or fundamentally unfair.

The foregoing opinion shall constitute our findings of fact and conclusions of law in accordance with which judgment will be entered in favor of defendants and against plaintiffs.