Howard L. TERRY and W. H. Hunt, Appellants,

v.

The PENN CENTRAL CORPORATION and Colt Industries Inc.

No. 81–2765.

United States Court of Appeals, Third Circuit.

Argued Nov. 5, 1981.

Decided Dec. 23, 1981.

Peter Hearn, Julia A. Conover, Jeffrey P. Libson, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for appellants; A. B. Conant, Jr. (argued), Shank, Irwin, Conant, Williamson & Grevelle, Dallas, Tex., Marshall, Bratter, Greene, Allison & Tucker, New York City, Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del., of counsel.

John H. Lewis, Jr. (argued), and Raymond T. Cullen, Philadelphia, Pa., for Penn Central Corp.; Morgan, Lewis & Bockius, Philadelphia, Pa., of counsel.

Christopher K. Walters and Gilbert J. Helwig, Reed Smith Townsend & Munson, Philadelphia, Pa., Arthur L. Liman (argued), Gerald D. Stern, Colleen McMahon, Jay Cohen, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Colt Industries Inc.

Before ADAMS, MARIS and HIGGINBOTHAM, Circuit Judges.

OPINION OF THE COURT

ADAMS, Circuit Judge.

The Penn Central Corporation ("Penn Central"), an appellee in this case, has sought to acquire Colt Industries Inc. ("Colt"), also an appellee, by merging Colt with PCC Holdings, Inc. ("Holdings"), a wholly-owned subsidiary of Penn Central. Howard L. Terry and W. H. Hunt, the appellants, are shareholders of Penn Central who objected to the transaction. In a diversity action before the United States District Court for the Eastern District of Pennsylvania, appellants sought injunctive

and declaratory relief to enforce voting and dissenters' rights to which appellants asserted they were entitled. Appellants further sought to enjoin Holdings from proceeding with the proposed merger, and in particular moved to enjoin a vote on the transaction, scheduled for October 29, 1981, by the shareholders of Penn Central. In an opinion issued on October 22, 1981, Judge Pollak denied appellants' requests. Appellants thereupon filed an appeal in this Court, and then petitioned for a temporary injunction against the proposed shareholder vote until the appeal on the merits of the district court order could be heard. On October 27, following oral argument, we entered an order denying the petition for temporary injunction, stating that appellants had failed to demonstrate a sufficient likelihood of prevailing on the merits. C.A. No. 81–3955. The shareholders of Penn Central voted, as scheduled, on October 29. Pursuant to an expedited hearing schedule, the appeal from the district court's denial of injunctive and declaratory relief was submitted to this Court following oral argument on November 5.

After argument on appeal, the shareholders disapproved of the merger, and the corporations thereafter publicly announced their abandonment of this particular merger. Penn Central, however, has not abandoned its proposed series of acquisitions, of which the Colt acquisition was merely one instance.

I.

Penn Central is the successor to the Penn Central Transportation Corporation, which underwent a reorganization under the bankruptcy laws that was completed in 1978. No longer involved in the railroading business, Penn Central, since 1978, has had the advantage, for tax purposes, of a large loss carry-forward. In order to put that loss carry-forward to its best use, Penn Central has embarked on a program of acquiring corporations whose profits could be sheltered. To this end Penn Central created Holdings, a wholly-owned subsidiary which was to acquire the businesses that Penn Central desired. The first acquisition under the plan was Marathon Manufacturing Company ("Marathon"), in 1979. In the Marathon acquisition, a class of preferred Penn Central stock was created, and 30 million shares of "First Series Preference Stock" was issued to the owners of Marathon stock. Appellants were shareholders of Marathon who thereby obtained shares of this First Series Preference Stock. Terry was promptly elected to the Penn Central board of directors.

In 1981, Penn Central decided upon another acquisition: Colt. The management and directors of Colt and Penn Central agreed upon a merger of Colt into Holdings, compensated for by issuance of a second series of Penn Central preference stock to Colt shareholders. Terry opposed the merger at the directors' meeting, and sought to preclude the consummation of the transaction.

Appellants proffered before the district court and reiterate before this Court a number of arguments. First, appellants assert that under the terms of the Penn Central Articles of Incorporation, as amended in 1979, the holders of First Series Preference Stock are entitled to a class vote on a transaction such as the Colt-Holdings merger, in which vote a two-thirds majority of First Series shareholders would be required to authorize the merger.[1] Second, appellants argue that under Pennsylvania's corporate law, they are entitled to dissent and appraisal rights if the merger is adopted over their opposition.[2] Finally, appellants

---

1. Appellants also asserted in the district court that they were entitled to a class vote under New York Law, N.Y.Bus.Corp.Law § 804(a). The district court held that New York law was not applicable, and appellants do not seek review of that ruling in this Court.

2. In addition, appellants claim a right under Pennsylvania law to require approval of an absolute majority vote of the shares outstanding on the proposed merger, relying on § 902(B), of the Pennsylvania Business Corporation Law (PBCL), 15 P.S. § 1902(B) (Purdon Supp. 1981–82). For the reasons discussed in Part III of this opinion, we conclude that Penn

maintain that the Penn Central proxy statement regarding the merger contained materially misleading statements regarding the above matters. The district court held that neither of the first two claims was correct as a matter of law. It then noted that the third claim was contingent on the merits of the first two claims, and accordingly held against appellants on that claim as well.

■ Because Colt and Penn Central have now announced their abandonment of the proposed merger, the request for injunctive relief considered by the district court is now conceded by all parties to be moot. However, the appellants' request for declaratory relief, which the appellants now contend is moot as well, involves legal questions that go to Penn Central's plan of acquisitions, rather than to the Colt transaction alone, and these questions appear likely to recur in future disputes between the parties here. It is clear from the record that the Colt merger was one in a series of similar acquisitions by Penn Central. The appellants, one of whom has now objected to each of the last two proposed acquisitions by Penn Central, will continue to have a lively interest in challenging any future amalgamations structured in roughly the same manner as the transaction before us now. The

declaratory relief requested here thus arises from a genuine and continuing controversy, and involves adverse parties who have diligently presented their cases to this Court. The continuing threat of legal action creates some present injury, and not merely a speculative future injury, to Penn Central: without a judgment on the merits of this appeal, Penn Central's present ability to negotiate other acquisitions will be severely impaired by the desire of potential merger partners to avoid the legal complications faced by Penn Central and Colt. In a case such as this, a voluntary termination by the parties of the specific activity challenged in the lawsuit—here, the proposed treatment of the dissenting preferred shareholders in the Colt-Holdings plan—does not render the action moot because there is "a reasonable likelihood that the parties or those in privity with them will be involved in a suit on the same issues in the future." *American Bible Society v. Blount*, 446 F.2d 588, 595 (3d Cir. 1971); *Marshall v. Whittaker Corp.*, 610 F.2d 1141, 1147 (3d Cir. 1979).[3]

Although we order that the district court dismiss as moot its order with respect to injunctive relief, we do not conclude that the entire case is moot. Instead, we affirm the judgment of the district court to the

Central is not a "party" to the merger, within the technical meaning of the term under that section and the related Section 908 of the PBCL, 15 P.S. § 1908 (Purdon Supp. 1981–82). Accordingly, section 902 does not apply to the Penn Central vote on the merger.

**3.** *Cf. United States v. W. T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953) ("Public interest in having the legality of the practices settled, militates against a mootness conclusion"); *Phillips v. Pennsylvania Higher Education Assistance Agency*, 657 F.2d 554, 569 (3d Cir. 1981); *Avco Corporation v. Local Union # 787*, 459 F.2d 968, 974 (3d Cir. 1972).

Moreover, we believe that the situation before us is similar to those described by the Supreme Court as capable of repetition yet evading review. In *Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974), the Supreme Court held that a state law providing strikers with welfare benefits created a live controversy between the state and a company whose striking employees had received such benefits, even after the strike itself had been resolved. The Court reasoned

that the availability of welfare benefits had a continuing effect on labor-management relations even when a strike was not in process, and expressed concern that the usually short duration of strikes would defeat effective judicial review of the controversy if the case were moot following settlement of the strike. 416 U.S. at 123–27, 94 S.Ct. at 1698–1700. In this case, the threat of legal action by shareholders such as Terry and Hunt, and their assertion of entitlement to dissent and appraisal rights, will affect subsequent merger proposals by Penn Central and may contribute to the defeat of such proposals by shareholders who wish to avoid incurring legal liability on the part of Penn Central. Revival of the claims that have been presented in this litigation may prevent any merger plan from surviving long enough for a reviewing court to decide on the issues we now face. It would not appear to be equitable or just to permit such a threat to be raised continually when, as we decide below, Penn Central's rejection of the appellants' claims is legally justified.

extent that it denies the declaratory relief sought by appellants, for substantially the reasons set forth by the district court.

In light of the complete and well-reasoned opinion of the district court 527 F.Supp. 118 (E.D.Pa.1981), we do not believe it necessary to discuss each of the appellants' claims in detail. However, we briefly set out below our reasons for affirming the district court's order.

## II.

Appellants assert that under Section 5(d) of the Penn Central Amended Articles of Incorporation,[4] they are entitled, as holders of First Series Preference Stock, to a class vote on the authorization of the issuance of any later series of preference stock. Specifically, they maintain that Penn Central may not issue the proposed Second Series Preference Stock to the acquired company's shareholders without the approval of two-thirds of the present First Series shareholders. Reviewing the language of Section 5(d), we note that a careful distinction is drawn between the rights of Preference shareholders against other shareholders on the one hand, and of First Series stockholders against other Series stockholders on the other. Because the proposed merger does not create shares that are superior in any way to the Preference shares generally, we conclude that the only language even arguably relevant is the language addressing the rights of First Series stockholders against the issuance of a later series. Section 5(d) provides, in that respect, that First Series shareholders are entitled to a class vote before the corporation may modify the Articles of Incorporation or authorize a merger that would "adversely affect the First Series Preference Stock but would not adversely affect each other series of Preference Stock." No class vote, however, is required for the issuance of "any shares of

---

4. That Section provides:

(d) The Corporation may, in the manner provided by Article Ninth hereof and as permitted by Pennsylvania law, from time to time alter or change the voting rights, preferences, qualifications, privileges, limitations, restrictions, options, conversion rights or other special or relative rights of the First Series Preference Stock; provided, however, that without the affirmative vote of the holders of at least two-thirds of the outstanding shares of all series of Preference Stock, the Corporation shall not amend, alter, change, add or insert any provision in these Articles which, or authorize the merger or consolidation of the Corporation with any other corporation if the plan of such merger or consolidation contains any provision which if contained in these Articles, would (i) make any adverse change in the voting rights, preferences, qualifications, privileges, limitations, restrictions, options, conversion rights or special or relative rights of Preference Stock, (ii) authorize a new class of stock senior or superior to Preference Stock, or (iii) increase the number of authorized shares of a senior or superior class of stock, and, without the affirmative vote of the holders of at least a majority of the outstanding shares of all series of Preference Stock, the Corporation shall not amend, alter, change, add or insert any provision in these Articles which, or authorize the merger or consolidation of the Corporation with any other corporation if the plan of such merger or consolidation contains any provision which if contained in these Articles, would increase the authorized number of shares of Preference Stock. *Without the affirmative vote of the holders of at least two-thirds of the outstanding shares of First Series Preference Stock, the Corporation shall not amend, alter, change, add or insert any provision in these Articles which, or authorize the merger or consolidation of the Corporation with any other corporation if the plan of such merger or consolidation contains any provision which if contained in these Articles, would adversely affect the First Series Preference Stock but would not adversely affect each other series of Preference Stock.* The holders of First Series Preference Stock shall not be entitled to participate in any such class vote if provision is made pursuant to Section 6 for the redemption at or prior to the time when any such alteration or change is to take effect of all shares of First Series Preference Stock at the time outstanding. *Nothing in this Section 5 shall require a class vote or consent in connection with the authorization, designation, increase or issuance of any shares of any class or series of capital stock which is subordinate to shares of First Series Preference Stock as to dividends and liquidation preference,* or in connection with the authorization, designation, increase or issuance of any bonds, mortgages, debentures or other obligations of the Corporation, or because of any adjustment in the provisions of First Series Preference Stock made pursuant to Section 4(c). (Emphasis added)

any class or series of capital stock which is subordinate to shares of First Series Preference Stock...." Appellants construe these sections as requiring a class vote for the issuance of this Second Series Preference Stock because it is not "subordinate," but rather on a par with, the First Series stock, and because the proposed Second Series stock allegedly has some voting rights superior to those of First Series stock such that its creation "adversely affects" First Series stock but not other series of preference stock.

As the district court held, this argument misconstrues section 5(d). The district court found that, at the time of the creation of the First Series Preference Stock, the persons acquiring that stock specifically sought and were denied the right to a class vote on the issuance of subsequent series of equivalent preference stock—the very right they now claim. Moreover, the district court found, again as a factual matter, that the proposed Second Series shareholders would not have any rights superior to those holding First Series stock. Neither finding is clearly erroneous, and we therefore conclude that nothing in Section 5(d) requires a class vote by the First Series shareholders on the issuance of the proposed Second Series.

### III.

Terry and Hunt contend that under Pennsylvania law they are entitled to dissent and appraisal rights [5] if a merger is approved by the Penn Central shareholders. As the district court concluded, this assertion is unsupported by Pennsylvania statute or caselaw. Sitting as a court in diversity, we are not at liberty to diverge from the outcome that the Pennsylvania legislature and the Pennsylvania courts prescribe. Briefly, appellants' argument is that the proposed merger between Holdings and Colt constitutes a *de facto* merger between Colt and Penn Central, and that the Penn

Central shareholders are therefore entitled to the protections for dissenting shareholders that Pennsylvania corporate law provides for shareholders of parties to a merger. Although this reasoning, with its emphasis on the substance of the transaction rather than its formal trappings, may be attractive as a matter of policy, *see, e.g.,* Note, *Three-Party Mergers: The Fourth Form of Corporate Acquisition,* 57 Va.L. Rev. 1242 (1971), it contravenes the language employed by the Pennsylvania legislature in setting out the rights of shareholders.

Section 908 of the Pennsylvania Business Corporation Law (PBCL), 15 P.S. § 1908, provides that shareholders of corporations that are parties to a plan of merger are entitled to dissent and appraisal rights, but adds that for an acquisition other than such a merger, the only rights are those provided for in Section 311 of the PBCL, 15 P.S. § 1311 (Purdon 1967 & Supp. 1981–82). Section 311, in turn, provides for dissent and appraisal rights only when an acquisition has been accomplished by "the issuance of voting shares of such corporation to be outstanding immediately after the acquisition sufficient to elect a majority of the directors of the corporation." In this case the shares of Penn Central stock to be issued in the Colt transaction do not exceed the number of shares already existing, and thus the transaction is not covered by Section 311. Any statutory dissent and appraisal rights for Penn Central shareholders are therefore contingent upon Penn Central's status as a party to the merger within the meaning of Section 908. And as the district court points out, the PBCL describes the parties to a merger as those entities that are *actually* combined into a single corporation. Section 907, 15 P.S. § 1907 (Purdon Supp. 1981–82), states that:

Upon the merger or consolidation becoming effective, the several corporations parties to the plan of merger or consolidation shall be a single corporation which,

---

5. Dissent and appraisal rights, where made available by statute or agreement, provide a shareholder who disapproves of a merger or other corporate action the opportunity to ex- change its shares with the corporation for an appraised value of their worth prior to the merger or other action. *See* 15 P.S. § 1515 (Purdon 1967 & Supp.1981–82).

in the case of a merger, shall be that corporation designated in the plan of merger as the surviving corporation....

At the consummation of the proposed merger plan here, both Holdings and Penn Central would survive as separate entities, and it would therefore appear that Penn Central is not a party within the meaning of the Section 907. We can discern no reason to infer that the legislature intended the word "party" to have different meanings in Sections 907 and 908, and accordingly conclude that Penn Central is not a party to the merger.

Appellants argue that Penn Central is nevertheless brought into the amalgamation by the *de facto* merger doctrine as set out in Pennsylvania law in *Farris v. Glen Alden Corp.*, 393 Pa. 427, 143 A.2d 25 (1958). *Farris* was the penultimate step in a *pas de deux* involving the Pennsylvania courts and the Pennsylvania legislature regarding the proper treatment for transactions that reached the same practical result as a merger but avoided the legal form of merger and the concomitant legal obligations. In the 1950s the Pennsylvania courts advanced the doctrine that a transaction having the effect of an amalgamation would be treated as a *de facto* merger. *See, e.g., Bloch v. The Baldwin Locomotive Works*, 75 Pa.D. & C. 24 (1950). The legislature responded with efforts to constrict the *de facto* merger doctrine. *Farris*, addressing those efforts, held that the doctrine still covered a reorganization agreement that had the effect of merging a large corporation into a smaller corporation. In a 1959 response to *Farris*, the legislature made explicit its objection to earlier cases that found certain transactions to be *de facto* mergers. The legislature enacted a law, modifying *inter alia* Sections 311 and 908, entitled in part:

An Act ... changing the law as to ... the acquisition or transfer of corporate assets, the rights of dissenting shareholders, ... abolishing the doctrine of de facto mergers or consolidation and reversing the rules laid down in *Bloch v. Baldwin Locomotive Works*, 75 D & C 24, and *Marks v. The Autocar Co.*, 153 F.Supp. 768, ....

Act of November 10, 1959 (P.L. 1406, No. 502).

Following this explicit statement, the *de facto* merger doctrine has rarely been invoked by the Pennsylvania courts. Only once has the Pennsylvania Supreme Court made reference to it, in *In re Jones & Laughlin Steel Corp.*, 488 Pa. 524, 412 A.2d 1099 (1980). Even there, the Court's reference was oblique. It merely cited *Farris* for the proposition that shareholders have the right to enjoin "proposed unfair or fraudulent corporate actions." 488 Pa. at 533, 412 A.2d at 1104. This Court, sitting in diversity in *Knapp v. North American Rockwell Corp.*, 506 F.2d 361 (3d. Cir. 1974), *cert. denied*, 421 U.S. 965, 95 S.Ct. 1955, 44 L.Ed.2d 452 (1975), made reference to the *de facto* merger doctrine to hold that a transaction structured as a sale of assets could nevertheless be deemed a merger for purposes of requiring the merging corporation to assume the acquired corporation's liability for damages to a worker who was injured by a faulty piece of equipment manufactured by the acquired company. Perhaps the broadest application of the doctrine was made in *In re Penn Central Securities Litigation*, 367 F.Supp. 1158 (E.D.Pa. 1973), in which the district court held that the doctrine provided the plaintiffs in that case with standing for a 10b–5 lawsuit alleging *fraud* and also gave rise to dissent and appraisal rights in a triangular merger situation.[6]

6. Two other cases in the Eastern District of Pennsylvania have also discussed *Farris* and *de facto* mergers, each case holding that the transaction before the court did not constitute a *de facto* merger. In *Dower v. Mosser Industries, Inc.*, 488 F.Supp. 1328, 1341 (E.D.Pa.1980), *aff'd*, 648 F.2d 183 (1981), the district court distinguished *Farris* because the transaction in *Dower*, unlike that in *Farris*, was not fraudu-

lent in any way. In *Lopata v. Bemis Co.*, 383 F.Supp. 342 (E.D.Pa.1974), *vacated on other grounds*, 517 F.2d 1398 (1975), the district court found *Farris* inapplicable because in *Lopata*, unlike *Farris*, there was no "basic fundamental change in the relationship of the stockholders to their respective corporations." 383 F.Supp. at 345.

None of these cases persuades us that a Pennsylvania court would apply the *de facto* merger doctrine to the situation before us. Although *Jones & Laughlin Steel* suggests that dissent and appraisal rights might be available if fraud or fundamental unfairness were shown, we are not faced with such a situation. No allegation of fraud has been advanced, and the only allegation of fundamental unfairness is that the appellants will, if the merger is consummated, be forced into what they consider a poor investment on the part of Penn Central without the opportunity to receive an appraised value for their stock. Even if appellants' evaluation of the merits of the proposed merger is accurate, poor business judgment on the part of management would not be enough to constitute unfairness cognizable by a court. And the denial of appraisal rights to dissenters cannot constitute fundamental unfairness, or the *de facto* merger doctrine would apply in every instance in which dissenters' rights were sought and the 1959 amendments by the legislature would be rendered nugatory.[7]

The two federal cases invoking the doctrine, *Knapp* and *Penn Central Securities*, are not persuasive as to the applicability of the *de facto* merger to the present situation. *Knapp* was not concerned with the rights of shareholders as the Pennsylvania legislature was in 1959. Although *Penn Central Securities* did hold, in part, that the triangular merger there constituted a *de facto* merger, it is clear from the briefs submitted to the district court in that case that the court was not made aware of the post-*Farris* 1959 amendments or the legislative statement of intent to limit the *de facto* merger doctrine.

In the absence of any explicit guidance to the contrary by the Pennsylvania courts, we conclude that the language of the legislature in 1959 precludes a decision that the transaction in this case constitutes a *de facto* merger sufficient to entitle Penn Cen-

tral shareholders to dissent and appraisal rights. We therefore hold that appellants do not possess such rights if a transaction such as the one involved here is consummated.

## IV.

Because we conclude that the district court correctly held that appellants were not entitled to a class vote on the proposed merger, a requirement of approval by an absolute majority of the shares outstanding, or dissent and appraisal rights in the event that the merger is approved, the order of the district court denying declaratory relief will be affirmed. The case, however, will be remanded to the district court to set aside as moot its order with respect to injunctive relief.

---

7. A different result might be reached if here, as in *Farris*, the acquiring corporation were significantly smaller than the acquired corporation such that the acquisition greatly transformed the nature of the successor corporation. But in this situation we do not have such a case; after the merger Penn Central would remain a major, diversified corporation, and would continue on the course of acquiring other corporations.