**EQUITY GROUP HOLDINGS, Plaintiff,**

v.

**DMG, INC.; Diversified Mortgage Investors, Inc.; Carlsberg Corporation; Carlsberg Resources Corporation; Michael A. Mash, Jr.; Billy F. Vaughn; Richard P. Carlsberg; William W. Geary, Jr.; Maurice H. Stans; Charles A. Bucks; Norbert A. Schlei; Jack L. Schram; Ronald S. Tankersley; and Charles E. Young, Defendants.**

**No. 83–8612–Civ.–SMA.**

United States District Court, S.D. Florida.

Dec. 15, 1983.

Richard C. Smith & Lewis F. Murphy, Steel, Hector & Davis, Miami, Fla., Ralph C. Ferrera, Debevoise & Plimpton, Washington, D.C., for plaintiff.

David L. Ross, and Stanley Wakshlag, and Harvey Goldman, Greenberg, Traurig, Askew, Hoffman, Tipoff & Wolf, P.A., Miami, Fla., Kurt Koegler, of Skadden, Apps, Slate, Meagher & Flom, New York City, Norbert A. Schlei, and H.F. Hart, Hughes, Hubbard & Reed, Los Angeles, Cal., for defendants.

## ORDER DENYING PRELIMINARY INJUNCTION

ARONOVITZ, District Judge.

### INTRODUCTION

THIS CAUSE was heard by the Court on December 13, 1983, upon Plaintiff's Motion for Preliminary Injunction, in which Plaintiff sought the following relief:

1. A judicial declaration that Section 607.221 of the Florida Corporation Act is applicable to the vote of DMG shareholders with respect to the issuance of approximately 12.5 million (12,500,000) shares of DMG common stock pursuant to the proposed Merger between *DMI and Carlsberg,* and that accordingly a majority of the outstanding shares of DMG must be voted in favor of such transaction if it is to take place at all; and

2. A judicial declaration that the issuance of two million (2,000,000) shares of DMG stock to Carlsberg Resources is an integral part of the aforementioned transaction, thereby rendering the transaction a *de facto* merger between *DMG and Carlsberg,* invoking Florida Corporation Act Section 607.221, which would, if applicable, require the approval of a majority of votes of the outstanding shares of DMG.

BY AGREEMENT of all counsel, these issues have been presented to the Court on the basis of a Stipulation of Agreed Facts, Affidavits (as to which the Court has noted the reserved objections of counsel as to the admissibility of portions thereof under the Rules of Evidence), various Memoranda of Law, Exhibits, and extensive argument presented in Court over approximately five and one-half hours. No evidence was taken *only* because the parties on both sides chose not to offer any evidence, although the hearing had been noticed by the Court as an EVIDENTIARY HEARING. Counsel were well advised that the Court was ready, willing and able to hear testimony and receive evidence on this matter.

The undisputed facts as stipulated by the parties can be summarized as follows: Defendant, DMG, Inc. ("DMG"), a Florida corporation, is a holding company which has no assets or operations. It is the listed (New York Stock Exchange) parent corporation of a wholly-owned subsidiary, Defendant Diversified Mortgage Investors, Inc. ("DMI"), a Florida corporation. DMG was incorporated in 1980 by DMI for the

purpose of carrying out a corporate reorganization. At that time, the shareholders of DMI automatically became shareholders of DMG.

DMI is an operating company, in prior years a Real Estate Investment Trust, which is now passively managing a portfolio of real estate holdings. It has an approximate One Hundred Million ($100,000,000) Dollar tax loss carry-forward. It is indebted to its bank in the sum of Twenty-three Million ($23,000,000) Dollars which is due and payable on December 31, 1983 in full.

Defendant Carlsberg Corporation ("Carlsberg"), a Delaware corporation, is the parent corporation of Defendant Carlsberg Resources Corporation ("Carlsberg Resources"), which in turn is wholly owned by Carlsberg. It is a diversified real estate firm, primarily engaged in land development and sale, residential and commercial real estate sites, general contracting, modular housing and real estate management.

Plaintiff Equity Group Holdings is a District of Columbia General Partnership which invests in real estate, real estate companies and manufacturing companies.

DMG had outstanding and issued stock, as of October 27, 1983, in the amount of seven million, four hundred thousand, (7,400,000) shares of common voting stock. Plaintiff Equity Group Holdings ("Equity" or "Equity Group" and related parties) owned approximately two million (2,000,000) shares of DMG common stock, representing 27.1% of such shares outstanding just prior to October 28, 1983. Equity's shares of DMG were purchased on the open market (the New York Stock Exchange) or in private sales. As of now, Equity may own two million, eight hundred thousand (2,800,000) shares of DMG.

On October 28, 1983, DMG, Carlsberg and Carlsberg Resources Corporation entered into a Stock Purchase Agreement, pursuant to which DMG agreed to issue two million (2,000,000) shares of DMG voting preferred stock, which had been authorized but unissued, in exchange for forty-four thousand, four hundred, forty-four (44,444) of the one hundred twenty-five thousand (125,000) shares of Carlsberg convertible preferred stock then held by Carlsberg Resources.

Also on October 28, 1983, DMG, DMI and Carlsberg entered into an Agreement and Plan of Merger (the "Merger Agreement"). Pursuant to the Merger Agreement, Carlsberg will merge into DMI; outstanding shares of Carlsberg will then be converted into DMG common. To accomplish this plan, approximately 12.5 million new shares of Common will be issued to shareholders of Carlsberg. Thereafter, some 64% of DMG Common Stock will be owned by Carlsberg shareholders.

DMG retained Blyth, Eastman, Paine, Webber, Inc., ("Blyth Eastman") as financial advisor and investment banker to advise DMG concerning the earlier aborted Master Shields acquisition, see *infra*, which had been supported by plaintiff, as well as the negotiations with regard to both the Stock Purchase Agreement between DMG and Carlsberg, and the Merger Agreement among DMG, DMI and Carlsberg. See Affidavit of Donald K. Miller, a managing director of Blyth, Eastman, wherein he opines that the DMI-Carlsberg merger was structured as it was on the basis of business and tax reasons and not with the intent of avoiding the voting requirements of Florida law applicable to mergers. No evidence to the contrary or contradicting same has been presented to this Court. Additionally, Blyth, Eastman delivered an opinion, a copy of which is attached to the Miller Affidavit finding the exchange of two million (2,000,000) shares of preferred stock by DMG with Carlsberg for forty-four thousand, four hundred forty-four (44,444) preferred shares of Carlsberg to be a fair transaction in terms of the exchange of the consideration involved, and likewise fair from a financial point of view to DMG. A similar opinion and finding is made with regard to the DMI-Carlsberg Merger Agreement. As of October 29, 1983, Carlsberg Resources Corporation owned some 27% of DMG's voting stock. This transaction increased the total amount

of voting stock of DMG by approximately 18.5%.

The New York Stock Exchange, wherein DMG is listed, requires that to validate the issuance of the authorized twelve and one-half million shares of DMG common stock that are to be issued to Carlsberg, a majority of DMG shareholders who are represented in person or by proxy at a meeting of shareholders must so vote. See NYSE Company Manual, A–283–284 (January 25, 1978). This election is necessary in order to maintain DMG's listing on the Exchange. Consequently, a shareholders' meeting of DMG has been currently scheduled for December 22, 1983, to vote on a corporate resolution approving the issuance by DMG of the 12.5 million shares of DMG common stock to shareholders of Carlsberg. DMG has also announced that officers and directors of Carlsberg will stand for election to the DMG Board of Directors at the shareholders' meeting scheduled for December 22, 1983, and that Carlsberg will seek to fill by election four of the seven directorial seats on the DMG Board.

In July 1983, prior to the Carlsberg/DMI merger talks, DMG had discussed a possible merger between itself or a subsidiary with Master Shield, Inc., an affiliate of Plaintiff. Master Shield, Inc., was to be merged into DMG in exchange for shares of DMG stock and notes. A Letter of Intent was executed, and implementing documents were drafted and exchanged by these parties, but Master Shield, Inc. decided not to proceed on the initially-agreed terms. Thereafter, Plaintiff revised its proposal on terms substantially more favorable to it. On October 27, 1983, DMG's Board of Directors rejected the revised proposal, in part upon the advice of Blyth Eastman. See Statement of Stipulated Facts at 32, 35; Affidavit of Michael A. Mash, Jr. at 9–11. The Carlsberg transactions, it was determined, were more favorable to DMG than Plaintiff's revised merger proposal.

All of the above facts as well as other pertinent details and information are contained in the jointly adopted Statement of Stipulated Facts submitted to the Court by counsel for all parties, affidavits, and other exhibits received of record.

## ISSUES ADDRESSED TO THE COURT

On the basis of the foregoing record and stipulated facts, the issues presented to the Court, in the procedural posture of a motion for preliminary injunction, can be summarized as follows:

Plaintiff contends that the two transactions at issue here, i.e., (a) the issuance of two million (2,000,000) voting preferred shares of DMG to Carlsberg, and (b) the merger of DMI and Carlsberg which results in issuance of 12.5 million shares of DMG common to Carlsberg, together constitute a *de facto* merger of *three* corporations: the present DMG, its subsidiary, DMI and Carlsberg; that the real merger is not only that between DMI and Carlsberg, but between DMG, the parent company, and Carlsberg; that, because Carlsberg is approximately three times the size of DMG, it is really Carlsberg which is surviving and DMG which is ceasing to exist after the merger; and that, if in fact these transactions together do constitute a *de facto* merger of DMG into Carlsberg, then Florida Corporation Law Section 607.221 requires a full majority of *all outstanding* shares to approve the transaction, rather than a *quorum of shares voted either at the December 22, 1983 meeting or by proxy*, which is all that is required under the rules of the New York Stock Exchange. See NYSE Company Manual A–283, 284 (January 25, 1978).

Plaintiff concedes that the transactions do not fall within the strict statutory wording of Florida Statute Section 607.221, and that therefore this Court would have to declare the transactions a *de facto* merger in order to find that the statute applies. Plaintiff further argues that if a *de facto* merger were declared in this case, the appropriate relief would be for the Court to issue a preliminary injunction against holding the shareholder vote at which only a quorum, rather than a full majority, would be required to effectuate the merger. The

Court notes that Plaintiff initially asked that this case be considered on the basis of an expedited motion for summary judgment. The Court denied such request, without prejudice to renewal at an appropriate time, on the basis that there was insufficient time for such discovery as would be necessary to fairly evaluate this issue or to dispose of it finally as a matter of law. The Court also notes that the Defendants would not have been able to obtain such discovery, of sufficient quality or quantity, as would have enabled the meaningful preparation of a response to such an expedited motion. A preliminary injunction was suggested by Plaintiff as an alternative form of relief, and it is on this basis that the Motion for Preliminary Injunction has come to be considered by the Court.

Defendants' central contention is that the Florida Merger Statute is inapplicable to the instant transaction because it does not require that the shareholders of a parent corporation be given the opportunity to vote upon the issuance of already authorized shares; that the merger between DMI and Carlsberg does not constitute a merger of DMG, the parent; and that all of the relevant shareholders—those of DMI and Carlsberg, which are the merging corporations—have been given or will be given the opportunity to vote upon the proposed transaction. Moreover, Defendants emphasize, it is the business judgment of DMG which is at issue when considering this transaction, either as a whole or in its separate parts. Defendants contend, and Plaintiffs concede, that within the strict construction of the face of the statute, the transaction at issue is not a statutory merger and is not subject to the majority outstanding requirement. Defendants further argue that a preliminary injunction is not necessary at this time, for the following reasons: if an injunction were not issued and the vote were to be taken as scheduled at the December 22, 1983 meeting, three alternative outcomes could emerge:

1. Plaintiff Equity Group could win the election by a majority of outstanding voting shares, which would render this litigation moot;

2. Defendant Carlsberg could prevail by a majority of the outstanding shares, which would render this litigation moot; or

3. Defendant Carlsberg could prevail, by a majority of votes cast, but by less than enough votes to satisfy Florida Statute Section 607.221, which would likely result in Plaintiff coming back to this Court for a ruling on the status of the matter.

On this basis, Defendants have argued that the potential harm to Plaintiff is not irreparable at this time, and that no harm might in fact result at all to Plaintiff if Plaintiff prevails at the election by an outright majority.

On the foregoing basis, the Court finds that the Plaintiff has not met its burden of proof sufficiently to support the issuance of a preliminary injunction. This is not to say that, given more facts and further discovery, the Court could not find that the transaction at issue is a *de facto* merger requiring a full majority vote of all the outstanding shares of DMG to be approved. However, in the present procedural posture of this litigation, on the basis of the record now before the Court, the relief requested by Plaintiff must be DENIED at this time.

The parties seem to agree that the DMI-Carlsberg Merger, the second of the two transactions at issue here, is a forward triangular merger: a wholly-owned subsidiary is acquiring the assets, liabilities, and stock of the target, a third-party corporation, after which the parent company and its original subsidiary will survive and the target will become part of the subsidiary. The key question before the Court is whether, as Plaintiff alleges, this requires that the Court treat the two transactions—the issuance of two million (2,000,000) shares of DMG voting preferred shares to Carlsberg, and the issuance of 12.5 million shares of common to effectuate a DMI-Carlsberg Merger—as a single transaction.

The reason to do so, Plaintiff alleges, is that in reality, Carlsberg will be taking control of DMG, rather than DMG acquiring Carlsberg as part of its subsidiary, DMI. Plaintiff argues that this is so because: (1) Carlsberg is three times the size of DMG; (2) the Carlsberg family will end up controlling a majority of DMG voting shares; (3) the President of Carlsberg will become the President of DMG; and (4) the DMG Board of Directors will·be composed of a majority of persons nominated by, and, essentially, voted in by, Carlsberg. These elements, Plaintiff has repeated in its papers as well as orally, constitute a situation in which, in reality, "the minnow is swallowing the whale".

The Court finds that under these facts and circumstances, on the basis of the record before it, Florida law does not necessarily stop or prevent the minnow from swallowing the whale where the business judgment of both the minnow and the whale is that the event will be mutually beneficial to both parties. Without evidence of a breach of fiduciary duty by the Officers/Directors of DMG or DMI or fundamental unfairness, or without allegations or proof of fraud, misrepresentation, *mala fides* or economic harm resulting from such merger, there is not presented to this Court a basis to invoke its equity jurisdiction. The Court again reiterates that this ruling is premised only on the basis of the facts now before the Court and a failure of Plaintiff to sustain its burden of proof on the four elements necessary to be shown as a predicate for a preliminary injunction.

The reason that the minnow may swallow the whale here is simply that nothing appears to prevent this from occurring. Each gets the opportunity to vote on the transaction. Florida law does not define the dilution of voting rights through the issuance of authorized stock as a matter which requires a full shareholder vote and the Florida legislature has specifically abolished preemptive rights. See Florida Corporation Act Section 607.077(1). DMG could go forward with the issuance of every one of its authorized but unissued shares, without asking the shareholders for approval. This is not to say that if this were done for fraudulent reasons or illegitimate business purposes, the shareholders would not have numerous causes of action on which to sue, both under state law and under the Federal Securities Laws. The Court is not precluding such actions, or holding that they would not be recognized, in this very case or any other. However, the parties have not presented these issues to the Court in this case, and Plaintiff has not raised these matters in the present verified amended complaint and motion. Moreover, no discovery has been taken in this regard, and the Court has been presented with no facts at this time as would warrant consideration of any issues other than the narrow question of corporate law which Plaintiff has argued is the only issue now faced by the Court.

Similarly, the consideration for both of these transactions is adequate under Florida law, or more than adequate. No shareholder approval would be required as to the consideration, which, for DMG, comes in the form of valuable shares of a larger, more diversified corporation. In and of itself, there is nothing wrong with DMG's· exchange of shares for a ten percent (10%) ownership interest in Carlsberg under the Stock Purchase Agreement which Plaintiff has argued is the first part of a necessarily integrated two-part merger process.

Carlsberg is becoming a party to the use of a One Hundred Million ($100,000,000) Dollar tax loss carry-forward with DMG, a substantial consideration regardless of its enhanced position of control of DMG. Similarly, DMG will be less likely to suffer a possible default and non-renewal of a Twenty-three Million ($23,000,000) Dollar loan from Continental Bank due in· full December 31, 1983; if default were to occur, it would seriously jeopardize DMG's continued existence. Equity, as well as other shareholders of DMG, will not be harmed *economically* by the Carlsberg-DMG transaction, since the book value of the shares would be roughly equivalent both before and after the DMI-Carlsberg merger. The pre-merger book value would

be Two and 77/100 ($2.77) Dollars per share, while the post-merger *pro forma* value would be Two and 70/100 ($2.70) Dollars. The Court cannot speculate on how the merger would affect the market price of DMG stock, except to note that it is not unlikely that a smaller supply of remaining shares traded could enhance the price of DMG's stock. The Court cannot opine, on the basis of the record now before it, as to whether the opposite effect would result, as Plaintiff contends, because investors would shy away from owning a smaller percentage piece of a bigger, more closely-controlled pie. In the case at bar, it would be a mistake for the Court to substitute its own judgment for the business judgment of the directors of the corporations involved as to the benefits ultimately to inure to shareholders, absent any evidence of breach of fiduciary duty, or fundamental unfairness, or overreaching. See *Buffalo Forge Co. v. Ogden*, 717 F.2d 757 [1983 Tfr. Binder] Fed.Sec.L.Rep. (CCH) ¶ 99,501 at 96,919 (2d Cir.1983); *Treadway Cos., Inc. v. Care Corp.*, 638 F.2d 357, 382–83 (2d Cir.1980).

Also worth noting is that even if a large enough number of shares of DMG were issued so as to change its management or its business nature, this alone, as an isolated business transaction, would not require a vote of the majority of shareholders of DMG under the Florida statutes. Cf. *Treadway Cos., Inc. v. Care Corp.*, 638 F.2d 357 (2d Cir.), reh'g and reh'g *en banc* denied (2d Cir.1980) ("[U]nder New Jersey law, shareholders must simply recognize that their positions may be diluted by the issuance of new shares. Id. at 383 n. 48.").

## STANDARDS FOR INJUNCTIVE RELIEF

The standards for issuance of a preliminary injunction have been defined to require the movant to show:

1. A substantial likelihood of success on the merits;

2. Irreparable injury if the injunction is not issued;

3. The threatened injury outweighs whatever harm the issuance of an injunction may cause the opposing party; and

4. The injunction would not be adverse to the public interest.

*Shatel Corp. v. Mao Ta Lumber & Yacht Corp.*, 697 F.2d 1352, 1354–55 (11th Cir. 1983); *Canal Authority of the State of Florida v. Callaway*, 489 F.2d 567 (5th Cir.1974). These prerequisites shall be addressed in turn.

1. *Likelihood of Success* —As explained more fully above, the Court cannot find at this time on this record that the transactions at issue together constitute a *de facto* merger of Carlsberg and DMG. Thus, the Court should not apply Florida Statute Section 607.221 to the arrangement between DMG, DMI and Carlsberg. The merger between DMI and Carlsberg comes within the ambit of the statute and both said Defendants have indicated an intent to comply therewith. However, nothing in the statute or the relevant case law would require the parent of a merging subsidiary to conduct a full vote of its shareholders. Moreover, the New York Stock Exchange rules are also being followed, and the appropriate voting standards are being applied pursuant thereto.

The Court fully comprehends Plaintiff's argument that, in effect, it is DMG that is being acquired by Carlsberg, which is much larger. Stated another way, Plaintiff has argued that this transaction is somewhat unique, in that it is in reality a reverse triangular merger, the subsidiary of DMG being merged into a third corporation—and the parent being merged therein as well. However, there is no evidence which supports the contention that this is in any way bad or unfair to the shareholders of DMG, or that the substance of the transaction so significantly differs from its form as to call these transactions anything other than what they appear to be, e.g., an exchange of stock and a merger of a third company into a subsidiary. After the transactions are completed, DMG shareholders will hold stock in the same corporate entity as previ-

ously, and the stock will continue to be traded on the New York Stock Exchange.

For the Court to apply Florida Statute Section 607.221 here, these transactions would have to be considered a "de facto" merger between DMG and Carlsberg. The Court recognizes that the de facto Merger doctrine has occasionally been used in situations in which the parties to a transaction structure it so as to avoid or circumvent the requirements of the applicable statutes. See *Rath v. Rath Packing Co.*, 257 Iowa 1277, 136 N.W.2d 410 (1965); *Applestein v. United Board & Carton Corp.*, 60 N.J.Super. 333, 159 A.2d 146 (N.J.Sup.Ct.Ch.Div.), aff'd, 33 N.J. 72, 161 A.2d 474 (1960); *Farris v. Glen Alden Corp.*, 393 Pa. 427, 143 A.2d 25 (1958). In these cases, it is important to realize, the Courts were faced with two-party transactions only. To apply these cases to the facts at bar would result simply in a finding that DMI and Carlsberg will be merging. This, of course, has been conceded by everyone involved. To bridge the gap in Plaintiff's conceptual analogy, Plaintiff has argued that because Carlsberg is larger than DMG and will essentially "control" DMG after the DMI/Carlsberg merger and the directorial elections, the real acquiror is Carlsberg and the real acquired is DMG. This argument is not without its intellectual appeal, and on a theoretical level it may be quite descriptive; but this is a Court of law and equity rather than one of metaphysics and philosophy. There is simply no basis in the case law to support Plaintiff's contentions sufficiently to constitute a ground for preliminary injunctive relief. But cf. *Terry v. Penn Central Corp.*, 668 F.2d 188, 194 n. 7 (3rd Cir.1981) (dicta).

In support of Defendants' arguments, on the other hand, stands a small body of law from outside this jurisdiction. While not binding on this Court, these decisions are insightful and informative. See *Perl v. I.U. International Corp.*, 61 Haw. 622, 607 P.2d 1036 (1980) (notwithstanding that parent formed subsidiary for sole purpose of merger with target, the Hawaii Supreme Court held that parent not a party, so no de facto merger was found with respect to

parent); *Allyn Corp. v. Hartford National Corp.*, [1982 Tfr. Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,646 at 93,181 (D.Conn.1982) ("Under Delaware law, a merger between a wholly-owned subsidiary and a third party is not to be treated as though it is a merger between the parent corporation and the third party."); cf. *Troupiansky v. Henry Disston & Sons*, 151 F.Supp. 609 (E.D.Pa. 1957) (dissenting shareholders of one party to a de facto merger were held entitled to sue the other party, which had become a subsidiary by acquiring the former's assets in exchange for stock, but the parent was dismissed because not a party to the de facto merger); cf. also *Terry v. Penn Central Corp.*, 668 F.2d 188 (3rd Cir.1981) (under a Pennsylvania statute enacted to minimize the applicability of the de facto merger doctrine, the Court noted: "No allegation of fraud has been advanced, and the only allegation of fundamental unfairness is that the appellants will, if the merger is consummated, be forced into what they consider will be a poor investment ... Even if appellants' evaluation of the merits of the proposed merger is accurate, poor business judgment on the part of management would not be enough to constitute unfairness cognizable by a court." Id. at 194).

The Court also does not find that DMG is in some sense the "alter ego" of DMI or vice-versa. Such a finding would require the Court to infer facts constituting fraud, bad faith, sham, or some other compelling reasons for piercing an apparently legitimate corporate "veil". See *Vantage View, Inc. v. Bali East Development Corp., Inc.*, 421 So.2d 728 (Fla. 4th D.C.A.1982); *Bendix Home Systems v. Hurston Enterprises, Inc.*, 566 F.2d 1039 (5th Cir.1978); *St. Petersburg Sheraton Corporation v. Stuart*, 242 So.2d 185 (Fla. 2d D.C.A.1970). No such factor appears in the stipulated facts or affidavits. DMG and DMI are separate corporate entities with different functions and different roles and interests, and the Court cannot consider them identical. If there are valid business reasons for so structuring two intimately related trans-

actions, the Court as a matter of equity shall not interfere absent some *form of* overreaching or foul play which does not appear here.

2. *Irreparable Injury*—In the first instance, it is not certain that the transactions will be approved on December 22, and therefore it is not at all clear that even those injuries asserted by Plaintiff will, in fact, materialize. Even if the merger were to be effectuated and later declared unlawful, the merger could be judicially unwound if the law required such action. See *SEC v. National Securities, Inc.*, 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1959) (trial court may return merged parties to premerger status if necessary). However, the crux of why Plaintiff has failed to satisfy the second prong of the injunctive relief test is not the issue *of ripeness or mootness or speculation.* It is, instead, Plaintiff's failure to articulate any cognizable injury *that could not be repaired.* Plaintiff's loss of voting power is not an injury which the Florida legislature has sought to define as such, and indeed, preemptive rights have been eliminated under Florida law. See Florida Statute Section 607.-077(1). Moreover, Plaintiff apparently seeks to block the merger so as to better position itself to accomplish some similar type of transaction. Nothing in the law of Florida gives Plaintiff any absolute right to accomplish a two-party transaction without the assent of the other party. As a Court of equity as well as of law, this Court cannot consider one proposed business transaction better or worse than another; it is the parties to the transaction who must make such decisions. See *Buffalo Forge Co. v. Ogden,* 717 F.2d 757 [1983 Tfr. Binder] Fed.Sec.L.Rep. (CCH) ¶ 99,501 at 96,919 (2d Cir.1983); *Treadway Cos. v. Care Corp.,* 638 F.2d 357 (2d Cir.1980). Finally, given Equity Group's not insignificant share ownership in DMG, it is apparent that anything which would strengthen DMG's financial position would ultimately inure to Equity Group's benefit as a shareholder. Plaintiff can always choose to sell its stock on the open market in the same way it was acquired. Thus no real *economic* injury will be sustained by Plaintiff if the transaction is effected. This Court will not declare voting power in a corporation to be a property right worthy of the type of protection Plaintiff seeks here, when the state legislature has declined to do so. The Court does not pass upon the rightness or wrongness of this issue; the Court only observes that it will not judicially create legislation for a state that has chosen not to do so. Moreover, as noted previously, even under the voting standards to which Plaintiff so vehemently objects, it is not certain that the DMI-Carlsberg merger will take place. At present, any injury about which Plaintiff might have a valid claim is purely speculative. The business judgment of the Board of Directors is what is really at issue here at this time.

3. *Balance of Harms*—As explained above, Plaintiff's harms primarily involve the loss of proportionate voting rights, which are not recognized by Florida law in this situation. On the other hand, to grant the preliminary injunction would substantially affect the business interests of Defendants DMG, DMI and Carlsberg. Most immediately, the injunction would seriously jeopardize DMG's financing arrangement with the Continental Illinois National Bank & Trust Company of Chicago. The company has outstanding approximately Twenty-Three Million ($23,000,000) Dollars of debt, which will place DMG in default on December 31, 1983, if the loan is not renewed. The bank has agreed in principle to an extension of DMG's credit if, among other things, the merger is consummated. If the loan were not renewed and DMG were unable to obtain financing elsewhere, DMG would face serious consequences which would inure to the detriment of all its shareholders, including Equity Group. Additionally, the merger between DMI and Carlsberg would increase shareholders' equity from approximately 20.5 million dollars to 54 million dollars; it would lower DMG's debt-to-equity ratio from 1.50:1 to 1.28:1; and it would only minimally affect DMG's book value per share ($2.77 vs.

$2.70). Similarly, Carlsberg would benefit by contributing to the use of DMI's One Hundred Million ($100,000,000) Dollar tax loss carry-over. To block the deal would thus frustrate the valid business purposes of the arrangement for the ultimate benefit of no party other than Plaintiff. The Court would nevertheless do so if the law so required, but here it is clear that at this point in time, the law imposes no such requirement.

4. *The Public Interest*—This issue does not come down squarely on either side. The Court does not deny that there is a public interest in corporate democracy at stake here, and that there is merit to Plaintiff's argument that shareholders in a public corporation should be given an opportunity to voice their opinion in a vote on matters of fundamental importance to them. However, it is of importance that the Court is here dealing with shares that were duly authorized by the shareholders of DMG through the 1980 Amendment to DMG's Articles of Incorporation, voted upon by a majority of holders of outstanding stock, which amendments specifically gave the directors the right to issue up to five million (5,000,000) shares of preferred stock *without further shareholder approval.*

The New York Stock Exchange requirement, that a majority of votes cast is required to approve the transaction, also cannot be overlooked. Shareholders are given the right to vote and are free to do so with respect to the DMG issuance of shares to Carlsberg; only the required percentage standard for approval differs between the New York Stock Exchange Rule and the statutory merger standard. The right to vote—or not to do so—is the essence of democracy and is not disregarded in the corporate transactions now before the Court.

Moreover, it cannot be said that corporate suffrage with respect to the shareholders of a parent corporation in a forward triangular merger of its subsidiary with another corporation is a value which the Florida legislature has seen fit to recog-

nize. Florida Statute Section 607.221 guarantees voting rights to the shareholders of the merging subsidiary and the third company, the target or non-surviving corporation; but the section does not contemplate the triangular situation with which the Court is herein faced. The Florida statutes permit the use of the parent's shares as merger consideration. Coupled with the tax advantages and tax-free status of the triangular merger under the Internal Revenue Code, and the convenience of a merger by exchange of stock rather than assets, this is just the type of transaction which the legislature cannot be presumed to have overlooked. In fact, it might be inferred that the legislature intentionally did *not* want to discourage such forms of merger by awarding voting or appraisal rights to the shareholders of the parent. It will be noted that commentators familiar with the drafting of provisions authorizing triangular mergers support exactly this position. See generally S. Schulman and Alan Schenk, "Shareholders' Voting and Appraisal Rights in Corporate Acquisition Transactions", THE BUSINESS LAWYER, vol. 38 at 1529, 1537–42 (August 1983), and authorities cited therein. As the Supreme Court of the United States noted in *United States R.R. Retirement Board v. Fritz*, 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980):

"[T]his Court has never insisted that a legislative body articulate its reasons for enacting a statute ... [W]e disagree with the District Court's conclusion that Congress was unaware of what it accomplished or that it was misled by the groups that appeared before it. If this test were applied literally to every member of any legislature that ever voted on a law, there would be very few laws which would survive it. The language of the statute is clear, and we have historically assumed that Congress intended what it enacted ..."

On the foregoing basis, this Court cannot surmise from the Florida Corporation Act that Florida intended anything other than to allow the type of transactions at issue in

the case at bar to occur without the necessity of a vote of a full majority of shareholders of the parent of the acquiror. Plaintiff has thus not met its burden with respect to establishing that the DMI-Carlsberg merger or the DMG issuance of stock to Carlsberg would be adverse to the public interest, as that term reflects the apparent intent of the Florida legislature. The Court infers that the legislature means what it does not say, as well as what it explicitly has set forth in the laws it has passed.

### CONCLUSION

THE FOREGOING shall constitute this Court's FINDINGS OF FACT and CONCLUSIONS OF LAW. It shall be noted that the Court considered the possibility of abstention in this matter as it involves essentially an interpretation of state law. However, given the nationwide ramifications of this litigation as it affects other shareholders of the large listed corporations involved, the scope and close relation with federal securities laws of the legal positions presented herein, the valid invocation of this Court's diversity jurisdiction, and the parties' pressing need for expedited treatment, this Court deemed abstention inappropriate. The Court further notes that at the close of oral argument, Plaintiff moved *ore tenus* to renew its motion for expedited treatment of this matter on a summary judgment basis. For the reasons articulated hereinabove, this Motion is again denied herewith without prejudice to be renewed at such time as the Court has a complete and substantial record upon which to base a summary final decision. The Court has not ruled herein on the merits of Plaintiff's Verified Complaint, and does not see fit to do so until a sufficient factual basis has been established through more extensive discovery, should the parties seek to proceed further with same.

By reason of the aforegoing, it is

ORDERED AND ADJUDGED that Plaintiff's Motion for Preliminary Injunction be and is hereby DENIED.